15-3775 (en banc)
*Zarda v. Altitude Express, Inc.*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

_____

August Term, 2017

(Argued: September 26, 2017　　Decided: February 26, 2018)

Docket No. 15-3775

_____

MELISSA ZARDA, co-independent executor of the estate of Donald Zarda, and WILLIAM ALLEN MOORE, JR., co-independent executor of the estate of Donald Zarda,

*Plaintiffs-Appellants,*

– v. –

ALTITUDE EXPRESS, INC., doing business as SKYDIVE LONG ISLAND, and RAY MAYNARD,

*Defendants-Appellees.*
_____

B e f o r e :

KATZMANN, *Chief Judge*, JACOBS, CABRANES, POOLER, SACK, RAGGI, HALL, LIVINGSTON, LYNCH, CHIN, LOHIER, CARNEY, and DRONEY, *Circuit Judges*.[*]

───────────────────

[*] Judge Sack and Judge Lynch, who are senior judges, are eligible to participate in this en banc pursuant to 28 U.S.C. § 46(c)(1) and 28 U.S.C. § 294(c).

1

KATZMANN, *C.J.*, filed the majority opinion in which HALL, CHIN, CARNEY, and DRONEY, *JJ.*, joined in full, JACOBS, *J.*, joined as to Parts I and II.B.3, POOLER, *J.*, joined as to all but Part II.B.1.b, SACK, *J.*, joined as to Parts I, II.A, II.B.3, and II.C, and LOHIER, *J.*, joined as to Parts I, II.A, and II.B.1.a.

JACOBS, *J.*, filed a concurring opinion.

CABRANES, *J.*, filed an opinion concurring in the judgment.

SACK, *J.*, filed a concurring opinion.

LOHIER, *J.*, filed a concurring opinion.

LYNCH, *J.*, filed a dissenting opinion in which LIVINGSTON, *J.*, joined as to Parts I, II, and III.

LIVINGSTON, *J.*, filed a dissenting opinion.

RAGGI, *J.*, filed a dissenting opinion.

_____

Donald Zarda brought this suit against his former employer alleging, *inter alia*, sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq*. In particular, Zarda claimed that he was fired after revealing his sexual orientation to a client. The United States District Court for the Eastern District of New York (Bianco, *J.*) granted summary judgment to the defendants on the ground that Zarda had failed to show that he had been discriminated against on the basis of his sex. After the Equal Employment Opportunity Commission ("EEOC") decided *Baldwin v. Foxx*, EEOC Decision No. 0120133080, 2015 WL 4397641 (July 15, 2015), holding that sex discrimination includes sexual orientation discrimination, Zarda asked the district court to reinstate his Title VII claim. The district court, citing our decision in *Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000), declined to do so. Zarda appealed and a panel of this Court affirmed.

We convened this rehearing en banc to consider whether Title VII prohibits discrimination on the basis of sexual orientation such that our

precedents to the contrary should be overruled. We now hold that sexual orientation discrimination constitutes a form of discrimination "because of . . . sex," in violation of Title VII, and overturn *Simonton* and *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217–23 (2d Cir. 2005), to the extent they held otherwise. We therefore **VACATE** the district court's judgment on the Title VII claim and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the judgment of the district court in all other respects.

—————————

GREGORY ANTOLLINO, New York, NY (Stephen Bergstein, Bergstein & Ullrich, LLP, Chester, NY, *on the brief*), *for Plaintiffs-Appellants*.

SAUL D. ZABELL, Zabell & Associates, P.C., Bohemia, NY, *for Defendants-Appellees*.

JEREMY HOROWITZ (James L. Lee, Deputy General Counsel, Jennifer S. Goldstein, Associate General Counsel, and Anne Noel Occhialino, Senior Appellate Attorney, *on the brief*), Equal Employment Opportunity Commission, Washington, DC, *for Amicus Curiae* Equal Employment Opportunity Commission, *in support of Plaintiffs-Appellants*.

GREGORY R. NEVINS (Michael D.B. Kavey, Attorney at Law, Brooklyn, NY; Omar Gonzalez-Pagan and Sharon M. McGowan, *on the brief*), Lambda Legal Defense and Education Fund, Inc., New York, NY, *for Amicus Curiae* Lambda Legal Defense and Education Fund, Inc., Atlanta, GA, *in support of Plaintiffs-Appellants*.

HASHIM M. MOOPPAN (Chad A. Readler and Tom Wheeler, Acting Assistant Attorneys General, Charles W. Scarborough and Stephen R. Marcus, Attorneys, *on the brief*), United States Department of Justice, Washington, DC, *for Amicus Curiae* United States of America, *in support of Defendants-Appellees*.

ADAM K. MORTARA, Bartlit Beck Herman Palenchar & Scott LLP,

Chicago, IL, *court-appointed Amicus Curiae in support of Defendants-Appellees.*

Erin Beth Harrist and Christopher Dunn, New York Civil Liberties Union Foundation, New York, NY; Fatima Goss Graves, National Women's Law Center, Washington, DC; Ria Tabacco Mar, Leslie Cooper, James D. Esseks, Lenora M. Lapidus, and Gillian L. Thomas, American Civil Liberties Union Foundation, New York, NY, *for Amici Curiae* American Civil Liberties Union; New York Civil Liberties Union; National Women's Law Center; 9to5, National Association of Working Women; A Better Balance; California Women's Law Center; Equal Rights Advocates; Feminist Majority Foundation; Gender Justice; Legal Voice; National Organization for Women (NOW) Foundation; National Partnership for Women & Families; Southwest Women's Law Center; Women Employed; Women's Law Center of Maryland, Inc.; and Women's Law Project, *in support of Plaintiffs-Appellants.*

Richard E. Casagrande, Robert T. Reilly, Wendy M. Star, and Christopher Lewis, New York State United Teachers, Latham, NY, *for Amicus Curiae* New York State United Teachers, *in support of Plaintiffs-Appellants.*

Richard Blum and Heidi Cain, The Legal Aid Society, New York, NY, *for Amicus Curiae* The Legal Aid Society, *in support of Plaintiffs-Appellants.*

Alice O'Brien, Eric A. Harrington, and Mary E. Deweese, National Education Association, Washington, DC, *for Amicus Curiae* The National Education Association, *in support of Plaintiffs-Appellants.*

Mary Bonauto, GLBTQ Legal Advocates & Defenders, Boston, MA; Christopher Stoll, National Center for Lesbian Rights, San Francisco, CA; Alan E. Shoenfeld, David M. Lehn, and Christopher D. Dodge, Wilmer Cutler Pickering Hale and

Dorr LLP, New York, NY, Washington, DC, and Boston, MA, *for Amici Curiae* GLBTQ Legal Advocates & Defenders ("GLAD") and National Center for Lesbian Rights ("NCLR"), *in support of Plaintiffs-Appellants*.

Thomas W. Burt, Microsoft Corporation, Redmond, WA; Sigismund L. Sapinski, Jr., Sun Life Financial (U.S.) Services Company, Inc., Windsor, CT; Todd Anten, Justin T. Reinheimer, and Cory D. Struble, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, *for Amici Curiae* AdRoll, Inc.; Ben & Jerry's; Beterment; Boston Community Capital; Brandwatch; CBS Corporation; Citrix Systems, Inc.; City Winery; Davis Steadman Ford & Mace, LLC; DoorDash, Inc.; Dropbox, Inc.; Eastern Bank; Edelman; FiftyThree, Inc.; Freedom for All Americans Education Fund; Google Inc.; Greater Burlington Industrial Corporation; Gusto; Harvard Pilgrim Health Care, Inc.; IAC/InterActiveCorp; IHS Markit Ltd.; Indiegogo; INUS Group LLC; Johnston, Kinney & Zulaica LLP; Kargo; KEO Marketing Inc.; Kickstarter, PBC; Levi Strauss & Co.; Linden Lab; Lyft, Inc.; Mapbox, Inc.; National Gay & Lesbian Chamber of Commerce; OBOX Solutions; On 3 Public Relations; Physician's Computer Company; Pinterest; Puma Springs Vineyards; Quora Inc.; S&P Global Inc.; Salesforce; Shutterstock, Inc.; Spotify; Thumbtack; TodayTix; Trust Company of Vermont; Vermont Gynecology; Viacom, Inc.; and Wealthfront Inc., *in support of Plaintiffs-Appellants*.

Peter T. Barbur, Cravath, Swaine & Moore LLP, New York, NY, *for Amici Curiae* Sen. Jeffrey A. Merkley, Sen. Tammy Baldwin, Sen. Cory A. Booker, and Rep. David N. Cicilline, *in support of Plaintiffs-Appellants*.

Matthew Skinner, LGBT Bar Association of Greater New York ("LeGaL"), New York, NY, *for Amici Curiae* LGBT Bar Association of Greater New York ("LeGaL"), Anti-Defamation League, Asian American Bar Association of New York,

Association of the Bar of the City of New York, Bay Area Lawyers for Individual Freedom, Hispanic National Bar Association, Legal Aid at Work, National Queer Asian Pacific Islander Alliance, New York County Lawyers' Association, and Women's Bar Association of the State of New York, *in support of Plaintiffs-Appellants*.

Eric T. Schneiderman, Attorney General, Barbara D. Underwood, Solicitor General, Steven C. Wu, Deputy Solicitor General, Andrew W. Amend, Senior Assistant Solicitor General of Counsel, State of New York, New York, NY; George Jepsen, Attorney General, State of Connecticut, Hartford, CT; Thomas J. Donovan, Jr., Attorney General, State of Vermont, Montpelier, VT, *for Amici Curiae* State of New York, State of Connecticut, and State of Vermont, *in support of Plaintiffs-Appellants*.

Joseph W. Miller, U.S. Justice Foundation, Ramona, CA; William J. Olson, Herbert W. Titus, Robert J. Olson, and Jeremiah L. Morgan, William J. Olson, P.C., Vienna, VA, *for Amici Curiae* Conservative Legal Defense and Education Fund, Public Advocate of the United States, and United States Justice Foundation, *in support of Defendants-Appellees*.

Kimberlee Wood Colby, Christian Legal Society, Springfield, VA, *for Amici Curiae* Christian Legal Society and National Association of Evangelicals, *in support of Defendants-Appellees*.

————————————

KATZMANN, *Chief Judge*:

Donald Zarda,[1] a skydiving instructor, brought a sex discrimination claim

---

[1] Zarda died in a BASE jumping accident after the district court awarded partial summary judgment but prior to trial on the remaining claims. The executors of his estate have

6

under Title VII of the Civil Rights Act of 1964 ("Title VII") alleging that he was fired from his job at Altitude Express, Inc., because he failed to conform to male sex stereotypes by referring to his sexual orientation. Although it is well-settled that gender stereotyping violates Title VII's prohibition on discrimination "because of . . . sex," we have previously held that sexual orientation discrimination claims, including claims that being gay or lesbian constitutes nonconformity with a gender stereotype, are not cognizable under Title VII.[2] *See Simonton v. Runyon*, 232 F.3d 33, 35 (2d Cir. 2000); *see also Dawson v. Bumble & Bumble*, 398 F.3d 211, 217–23 (2d Cir. 2005).

At the time *Simonton* and *Dawson* were decided, and for many years since, this view was consistent with the consensus among our sister circuits and the position of the Equal Employment Opportunity Commission ("EEOC" or "Commission"). *See, e.g.*, *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 471 (6th Cir. 2012); *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 289 (3d Cir. 2009); *Medina v.*

---

been substituted as plaintiffs. Zarda and the executors of his estate are referred to collectively as "Zarda" throughout this opinion.

[2] This opinion assumes *arguendo* that "sex" in Title VII "means biologically male or female," *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 362 (7th Cir. 2017) (en banc) (Sykes, *J.*, dissenting), and uses the terms "sex" and "gender" interchangeably, as do the Supreme Court and other circuits cited herein.

*Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Hamner v. St. Vincent*

*Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 704 (7th Cir. 2000); *Higgins v. New*

*Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999);[3] *Wrightson v. Pizza Hut*

*of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Williamson v. A.G. Edwards & Sons,*

*Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) (per curiam); *Blum v. Gulf Oil Corp.*, 597 F.2d

936, 938 (5th Cir. 1979) (per curiam); *see also Johnson v. Frank*, EEOC Decision No.

01911827, 1991 WL 1189760, at *3 (Dec. 19, 1991). But legal doctrine evolves and

in 2015 the EEOC held, for the first time, that "sexual orientation is inherently a

'sex-based consideration;' accordingly an allegation of discrimination based on

sexual orientation is necessarily an allegation of sex discrimination under Title

VII." *Baldwin v. Foxx*, EEOC Decision No. 0120133080, 2015 WL 4397641, at *5

(July 15, 2015) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242 (1989)

(plurality opinion)). Since then, two circuits have revisited the question of

whether claims of sexual orientation discrimination are viable under Title VII. In

March 2017, a divided panel of the Eleventh Circuit declined to recognize such a

---

[3] The First Circuit has since qualified *Higgins*, holding that a plaintiff may "bring[] sex-plus claims under Title VII where, in addition to the sex-based charge, the 'plus' factor is the plaintiff's status as a gay or lesbian individual." *Franchina v. City of Providence*, 881 F.3d 32, 54 (1st Cir. 2018).

claim, concluding that it was bound by *Blum*, 597 F.2d at 938, which "ha[s] not been overruled by a clearly contrary opinion of the Supreme Court or of [the Eleventh Circuit] sitting *en banc*." *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1257 (11th Cir.), *cert. denied*, 138 S. Ct. 557 (2017). One month later, the Seventh Circuit, sitting en banc, took "a fresh look at [its] position in light of developments at the Supreme Court extending over two decades" and held that "discrimination on the basis of sexual orientation is a form of sex discrimination." *Hively*, 853 F.3d at 340–41. In addition, a concurring opinion of this Court recently called "for the Court to revisit" this question, emphasizing the "changing legal landscape that has taken shape in the nearly two decades since *Simonton* issued," and identifying multiple arguments that support the conclusion that sexual orientation discrimination is barred by Title VII. *Christiansen v. Omnicom Grp., Inc.*, 852 F.3d 195, 202 (2d Cir. 2017) (Katzmann, *C.J.*, concurring) ("Christiansen and *amici* advance three arguments, none previously addressed by this Court . . . ."); *see also id.* at 204 ("Neither *Simonton* nor *Dawson* addressed [the but-for] argument.").

Taking note of the potential persuasive force of these new decisions, we convened en banc to reevaluate *Simonton* and *Dawson* in light of arguments not

previously considered by this Court. Having done so, we now hold that Title VII prohibits discrimination on the basis of sexual orientation as discrimination "because of . . . sex." To the extent that our prior precedents held otherwise, they are overruled.

We therefore **VACATE** the district court's judgment on Zarda's Title VII claim and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the judgment of the district court in all other respects.

## BACKGROUND

The facts and procedural history of this case are discussed in detail in our prior panel decision. *See Zarda v. Altitude Express*, 855 F.3d 76, 79–81 (2d Cir. 2017). We recite them only as necessary to address the legal question under consideration.

In the summer of 2010, Donald Zarda, a gay man, worked as a sky-diving instructor at Altitude Express. As part of his job, he regularly participated in tandem skydives, strapped hip-to-hip and shoulder-to-shoulder with clients. In an environment where close physical proximity was common, Zarda's co-workers routinely referenced sexual orientation or made sexual jokes around clients, and Zarda sometimes told female clients about his sexual orientation to

10

assuage any concern they might have about being strapped to a man for a tandem skydive. That June, Zarda told a female client with whom he was preparing for a tandem skydive that he was gay "and ha[d] an ex-husband to prove it." J.A. 400 ¶ 23. Although he later said this disclosure was intended simply to preempt any discomfort the client may have felt in being strapped to the body of an unfamiliar man, the client alleged that Zarda inappropriately touched her and disclosed his sexual orientation to excuse his behavior. After the jump was successfully completed, the client told her boyfriend about Zarda's alleged behavior and reference to his sexual orientation; the boyfriend in turn told Zarda's boss, who fired shortly Zarda thereafter. Zarda denied inappropriately touching the client and insisted he was fired solely because of his reference to his sexual orientation.

One month later, Zarda filed a discrimination charge with the EEOC concerning his termination. Zarda claimed that "in addition to being discriminated against because of [his] sexual orientation, [he] was also discriminated against because of [his] gender." Special Appendix ("S.A.") 3. In particular, he claimed that "[a]ll of the men at [his workplace] made light of the intimate nature of being strapped to a member of the opposite sex," but that he

was fired because he "honestly referred to [his] sexual orientation and did not conform to the straight male macho stereotype." S.A. 5.

In September 2010, Zarda brought a lawsuit in federal court alleging, *inter alia*, sex stereotyping in violation of Title VII and sexual orientation discrimination in violation of New York law. Defendants moved for summary judgment arguing that Zarda's Title VII claim should be dismissed because, although "Plaintiff testifie[d] repeatedly that he believe[d] the reason he was terminated [was] because of his sexual orientation . . . [,] under Title VII, a gender stereotype cannot be predicated on sexual orientation." Dist. Ct. Dkt. No. 109 at 3 (citing *Simonton*, 232 F.3d at 35). In March 2014, the district court granted summary judgment to the defendants on the Title VII claim. As relevant here, the district court concluded that, although there was sufficient evidence to permit plaintiff to proceed with his claim for sexual orientation discrimination under New York law, plaintiff had failed to establish a prima facie case of gender stereotyping discrimination under Title VII.

While Zarda's remaining claims were still pending, the EEOC decided *Baldwin*, holding that "allegations of discrimination on the basis of sexual orientation necessarily state a claim of discrimination on the basis of sex." 2015

WL 4397641 at *10. The Commission identified three ways to illustrate what it described as the "inescapable link between allegations of sexual orientation discrimination and sex discrimination." *Id.* at *5. First, sexual orientation discrimination, such as suspending a lesbian employee for displaying a photo of her female spouse on her desk while not suspending a man for displaying a photo of his female spouse, "is sex discrimination because it necessarily entails treating an employee less favorably because of the employee's sex." *Id.* Second, it is "associational discrimination" because "an employee alleging discrimination on the basis of sexual orientation is alleging that his or her employer took his or her sex into account by treating him or her differently for associating with a person of the same sex." *Id.* at *6. Lastly, sexual orientation discrimination "necessarily involves discrimination based on gender stereotypes," most commonly "heterosexually defined gender norms." *Id.* at *7–8 (internal quotation marks omitted). Shortly thereafter, Zarda moved to have his Title VII claim reinstated based on *Baldwin*. But, the district court denied the motion, concluding that *Simonton* remained binding precedent.

Zarda's surviving claims, which included his claim for sexual orientation discrimination under New York law, went to trial, where defendants prevailed.

After judgment was entered for the defendants, Zarda appealed. As relevant here, Zarda argued that *Simonton* should be overturned because the EEOC's reasoning in *Baldwin* demonstrated that *Simonton* was incorrectly decided. By contrast, defendants argued that the court did not need to reach that issue because the jury found that they had not discriminated based on sexual orientation.

The panel held that "Zarda's [federal] sex-discrimination claim [was] properly before [it] because [his state law claim was tried under] a higher standard of causation than required by Title VII." *Zarda*, 855 F.3d at 81. However, the panel "decline[d] Zarda's invitation to revisit our precedent," which "can only be overturned by the entire Court sitting in banc." *Id.* at 82. The Court subsequently ordered this rehearing en banc to revisit *Simonton* and *Dawson*'s holdings that claims of sexual orientation discrimination are not cognizable under Title VII.

## DISCUSSION

### I. Jurisdiction

We first address the defendants' challenge to our jurisdiction. Article III of the Constitution grants federal courts the authority to hear only "Cases" and

"Controversies." U.S. Const. art. III, § 2, cl. 1. As a result, "a federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'" *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). The defendants argue that any decision on the merits would be an advisory opinion because Zarda did not allege sexual orientation discrimination in his EEOC charge or his federal complaint and therefore the question of whether Title VII applies to sexual orientation discrimination is not properly before us.

Irrespective of whether defendants' argument is actually jurisdictional,[4] its factual premises are patently contradicted by both the record and the position defendants advanced below. Zarda's EEOC complaint explained that he was "making this charge because, in addition to being discriminated against because of [his] sexual orientation, [he] was also discriminated against because of [his] gender." S.A. 3.[5] Zarda specified that his supervisor "was hostile to any

---

[4] This Court has squarely held that failure to present a Title VII claim to the EEOC before filing suit in federal court "is not a jurisdictional prerequisite, but only a precondition to bringing a Title VII action that can be waived by the parties or the court." *Francis v. City of New York*, 235 F.3d 763, 768 (2d Cir. 2000) (alterations and internal quotation marks omitted).

[5] The full quotation is, "I am not making this charge on the grounds that I was discriminated on the grounds of my sexual orientation. Rather, I am making this charge because, in addition to being discriminated against because of my sexual orientation, I was also

expression of [his] sexual orientation that did not conform to sex stereotypes," and alleged that he "was fired . . . because . . . [he] honestly referred to [his] sexual orientation and did not conform to the straight male macho stereotype." S.A. 3, 5. Zarda repeated this claim in his federal complaint, contending that he was "an openly gay man" who was "discharge[d] because of a homophobic customer" and "because his behavior did not conform to sex stereotypes," in violation of Title VII. J.A. 65, 69, 75.

Defendants plainly understood Zarda's complaint to have raised a claim for sexual orientation discrimination under Title VII. In their motion for summary judgment, defendants argued that Zarda's claim "relies on the fact that Plaintiff is homosexual, not that he failed to comply with male gender norms. Thus, Plaintiff[] merely attempts to bring a defective sexual orientation claim

---

discriminated against because of my gender." S.A. 3. Although inartful and perhaps even confusing, the best interpretation of this statement, read in the context of the entire charge, is that Zarda alleged that the sexual orientation discrimination he experienced was a subset of gender discrimination. Even if otherwise, the governing rule is that "[c]laims not raised in an EEOC complaint . . . may be brought in federal court if they are reasonably related to the claim filed with the agency." *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 70 (2d Cir. 2006) (internal quotation marks omitted). A claim is considered reasonably related if the alleged conduct "would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (internal quotation marks omitted). Because Zarda's charge gave the Commission "adequate notice to investigate discrimination on both bases," it is irrelevant whether Zarda's EEOC complaint unequivocally alleged sexual orientation

16

under Title VII, which is legally invalid." Dist. Ct. Dkt. No. 109 at 9 (citing

*Dawson*, 398 F.3d at 221). The district court ultimately agreed.

Having interpreted Zarda's Title VII claim as one for sexual orientation

discrimination for purposes of insisting that the claim be dismissed, defendants

cannot now argue that there is no sexual orientation claim to prevent this Court

from reviewing the basis for the dismissal. Both defendants and the district court

clearly understood that Zarda had alleged sexual orientation discrimination

under Title VII. As a result, Zarda's Title VII claim is neither unexhausted nor

unpled, and so it may proceed.[6]

## II. Sexual Orientation Discrimination

### A. The Scope of Title VII

"In passing Title VII, Congress made the simple but momentous

announcement that sex, race, religion, and national origin are not relevant to the

---

discrimination. *Id.* (internal quotation marks omitted).

[6] Defendants' additional argument, which is that the executors of Zarda's estate lack standing to pursue this action, is premised on the representation that the sexual orientation claim under Title VII was not raised before the district court so the estate may not now raise that claim on the deceased plaintiff's behalf. Because we find that the sexual orientation claim was properly raised, we need not address this argument.

selection, evaluation, or compensation of employees." *Price Waterhouse*, 490 U.S.

at 239. The text of Title VII provides, in relevant part:

> It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a)(1). This "broad rule of workplace equality," *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993), "strike[s] at the entire spectrum of disparate treatment" based on protected characteristics, *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 707 n.13 (1978) (quoting *Sprogis v. United Air Lines, Inc.*, 444 F.2d 1194, 1198 (7th Cir. 1971)), "regardless of whether the discrimination is directed against majorities or minorities," *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71–72 (1977). As a result, we have stated that "Title VII should be interpreted broadly to achieve equal employment opportunity." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–36 (1971)).

In deciding whether Title VII prohibits sexual orientation discrimination, we are guided, as always, by the text and, in particular, by the phrase "because of . . . sex." However, in interpreting this language, we do not write on a blank

18

slate. Instead, we must construe the text in light of the entirety of the statute as well as relevant precedent. As defined by Title VII, an employer has engaged in "impermissible consideration of . . . sex . . . in employment practices" when "sex . . . was a motivating factor for any employment practice," irrespective of whether the employer was also motivated by "other factors." 42 U.S.C. § 2000e-2(m). Accordingly, the critical inquiry for a court assessing whether an employment practice is "because of . . . sex" is whether sex was "a motivating factor." *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014).

Recognizing that Congress intended to make sex "irrelevant" to employment decisions, *Griggs*, 401 U.S. at 436, the Supreme Court has held that Title VII prohibits not just discrimination based on sex itself, but also discrimination based on traits that are a function of sex, such as life expectancy, *Manhart,* 435 U.S. at 711, and non-conformity with gender norms, *Price Waterhouse,* 490 U.S. at 250–51. As this Court has recognized, "any meaningful regime of antidiscrimination law must encompass such claims" because, if an employer is "'[f]ree to add non-sex factors, the rankest sort of discrimination'" could be worked against employees by using traits that are associated with sex as

a proxy for sex. *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 119

n.9 (2d Cir. 2004) (quoting *Phillips v. Martin Marietta Corp.*, 416 F.2d 1257, 1260

(5th Cir. 1969) (Brown, *C.J.*, dissenting from denial of rehearing en banc)).

Applying Title VII to traits that are a function of sex is consistent with the

Supreme Court's view that Title VII covers not just "the principal evil[s]

Congress was concerned with when it enacted" the statute in 1964, but also

"reasonably comparable evils" that meet the statutory requirements. *Oncale v.*

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998).

With this understanding in mind, the question before us is whether an

employee's sex is necessarily a motivating factor in discrimination based on

sexual orientation. If it is, then sexual orientation discrimination is properly

understood as "a subset of actions taken on the basis of sex." *Hively*, 853 F.3d at

343.[7]

**B. Sexual Orientation Discrimination as a Subset of Sex Discrimination**

We now conclude that sexual orientation discrimination is motivated, at

_____

[7] Importantly, Title VII protection does not hinge on whether sexual orientation discrimination is "synonymous with sex discrimination." *Hively*, 853 F.3d at 363 (Sykes, *J.*, dissenting). While synonyms are coextensive, sex discrimination obviously encompasses more than sexual orientation discrimination, including sexual harassment and other recognized

20

least in part, by sex and is thus a subset of sex discrimination. Looking first to the text of Title VII, the most natural reading of the statute's prohibition on discrimination "because of . . . sex" is that it extends to sexual orientation discrimination because sex is necessarily a factor in sexual orientation. This statutory reading is reinforced by considering the question from the perspective of sex stereotyping because sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions. In addition, looking at the question from the perspective of associational discrimination, sexual orientation discrimination—which is motivated by an employer's opposition to romantic association between particular sexes—is discrimination based on the employee's own sex.

## 1. Sexual Orientation as a Function of Sex

### a. "Because of . . . sex"

We begin by considering the nature of sexual orientation discrimination. The term "sexual orientation" refers to "[a] person's predisposition or inclination toward sexual activity or behavior with other males or females" and is

---

subsets of sex discrimination.

21

commonly categorized as "heterosexuality, homosexuality, or bisexuality." *See*

*Sexual Orientation*, <u>Black's Law Dictionary</u> (10th ed. 2014). To take one example,

"homosexuality" is "characterized by sexual desire for a person of the same sex."

*Homosexual*, *id.; see also Heterosexual*, *id.* ("Of, relating to, or characterized by

sexual desire for a person of the opposite sex."); *Bisexual*, *id.* ("Of, relating to, or

characterized by sexual desire for both males and females."). To operationalize

this definition and identify the sexual orientation of a particular person, we need

to know the sex of the person and that of the people to whom he or she is

attracted. *Hively*, 853 F.3d at 358 (Flaum, *J.*, concurring) ("One cannot consider a

person's homosexuality without also accounting for their sex: doing so would

render 'same' [sex] . . . meaningless."). Because one cannot fully define a person's

sexual orientation without identifying his or her sex, sexual orientation is a

function of sex. Indeed sexual orientation is doubly delineated by sex because it

is a function of both a person's sex and the sex of those to whom he or she is

attracted. Logically, because sexual orientation is a function of sex and sex is a

protected characteristic under Title VII, it follows that sexual orientation is also

protected. *See id.* ("[D]iscriminating against [an] employee because they are

homosexual constitutes discriminating against an employee because of (A) the employee's sex, *and* (B) their sexual attraction to individuals of the *same sex*.").[8]

Choosing not to acknowledge the sex-dependent nature of sexual orientation, certain *amici* contend that employers discriminating on the basis of sexual orientation can do so without reference to sex.[9] In support of this assertion, they point to *Price Waterhouse*, where the Supreme Court observed that one way to discern the motivation behind an employment decision is to consider whether, "if we asked the employer at the moment of the decision what its reasons were and if we received a truthful response, one of those reasons would be" the applicant or employee's sex. 490 U.S. at 250. Relying on this language, these *amici* argue that a "truthful" response to an inquiry about why an employee was fired would be "I fired him because he is gay," not "I fired him because he is a man." But this semantic sleight of hand is not a defense; it is a

---

[8] The lead dissent rejects this "linguistic argument," Lynch, *J.*, Dissenting Op. at 29 (hereinafter "Lead Dissent"), and advocates that Title VII's prohibition must be understood in the context of the prejudices and popular movements animating national politics at the time the statute was enacted, particularly concerns about the sexual exploitation of women, *id.* at 15–28. But the dissent's account does not and cannot rebut the fact that sexual orientation is a sex-dependent trait.

[9] Notably, the government concedes that "as a logical matter . . . [y]ou could view sexual orientation as a subset of sex," however the government also insists that it could be "view[ed] . . . as a distinct category." Oral Arg. Tr. at 53:17-20.

distraction. The employer's failure to reference gender directly does not change the fact that a "gay" employee is simply a man who is attracted to men. For purposes of Title VII, firing a man because he is attracted to men is a decision motivated, at least in part, by sex. More broadly, were this Court to credit *amici*'s argument, employers would be able to rebut a discrimination claim by merely characterizing their action using alternative terminology. Title VII instructs courts to examine employers' motives, not merely their choice of words. *See* 42 U.S.C. § 2000e-2(m). As a result, firing an employee because he is "gay" is a form of sex discrimination.[10]

The argument has also been made that it is not "even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment discrimination 'because of sex' also banned discrimination because of sexual orientation[.]" *Hively*, 853 F.3d at 362 (Sykes, *J.*, dissenting). Even if that were so, the same could also be said of multiple forms of discrimination that are indisputably prohibited by Title VII, as the Supreme Court and lower courts

---

[10] Lest there be any doubt, this Court's holding that sexual orientation discrimination is a subset of sex discrimination encompasses discrimination based on a person's attraction to

have determined. Consider, for example, sexual harassment and hostile work environment claims, both of which were initially believed to fall outside the scope of Title VII's prohibition.

In 1974, a district court dismissed a female employee's claim for sexual harassment reasoning that "[t]he substance of [her] complaint [was] that she was discriminated against, not because she was a woman, but because she refused to engage in a sexual affair with her supervisor." *Barnes v. Train*, No. 1828-73, 1974 WL 10628, at *1 (D.D.C. Aug. 9, 1974). The district court concluded that this conduct, although "inexcusable," was "not encompassed by [Title VII]." *Id.* The D.C. Circuit reversed. Unlike the district court, it recognized that the plaintiff "became the target of her supervisor's sexual desires *because she was a woman*." *Barnes v. Costle*, 561 F.2d 983, 990 (D.C. Cir. 1977) (emphasis added). As a result the D.C. Circuit held that "gender cannot be eliminated from [plaintiff's formulation of her claim] and that formulation advances a prima facie case of sex discrimination within the purview of Title VII" because "it is enough that gender is a factor contributing to the discrimination." *Id*. Today, the Supreme Court and lower courts "uniformly" recognize sexual harassment claims as a violation of

---

people of the opposite sex, same sex, or both.

Title VII, *see, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67 (1986),

notwithstanding the fact that, as evidenced by the district court decision in

*Barnes*, this was not necessarily obvious from the face of the statute.

The Supreme Court has also acknowledged that a "hostile work

environment," although it "do[es] not appear in the statutory text," *Burlington*

*Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998), violates Title VII by affecting the

"psychological aspects of the workplace environment," *Meritor*, 477 U.S. at 64

(internal quotation marks omitted). As Judge Goldberg, one of the early

proponents of hostile work environment claims, explained in a case involving

national origin discrimination,

> [Title VII's] language evinces a Congressional intention to define
> discrimination in the broadest possible terms. Congress chose
> neither to enumerate specific discriminatory practices, nor to
> elucidate in extenso the parameter of such nefarious activities.
> Rather, it pursued the path of wisdom by being unconstrictive,
> knowing that constant change is the order of our day and that the
> seemingly reasonable practices of the present can easily become the
> injustices of the morrow.

*Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971). Stated differently, because

Congress could not anticipate the full spectrum of employment discrimination

that would be directed at the protected categories, it falls to courts to give effect

to the broad language that Congress used. *See Pullman-Standard v. Swint*, 456 U.S.

273, 276 (1982) ("Title VII is a broad remedial measure, designed 'to assure equality of employment opportunities.'" (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973))).

The Supreme Court gave voice to this principle of construction when it held that Title VII barred male-on-male sexual harassment, which "was assuredly not the principal evil Congress was concerned with when it enacted Title VII," *Oncale*, 523 U.S. at 79–80, and which few people in 1964 would likely have understood to be covered by the statutory text. But the Court was untroubled by these facts. "[S]tatutory prohibitions," it explained, "often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Id.* Applying this reasoning to the question at hand, the fact that Congress might not have contemplated that discrimination "because of . . . sex" would encompass sexual orientation discrimination does not limit the reach of the statute.

The dissent disagrees with this conclusion. It does not dispute our definition of the word "sex," Lead Dissent at 21, nor does it argue that this word had a different meaning in 1964. Instead, it charges us with "misconceiv[ing] the

27

fundamental public meaning of the language of" Title VII. *Id.* at 16 (emphasis omitted). According to the dissent, the drafters included "sex" in Title VII to "secure the rights of women to equal protection in employment," *id.* at 20, and had no intention of prohibiting sexual orientation discrimination, *id.* at 14–15. We take no position on the substance of the dissent's discussion of the legislative history or the zeitgeist of the 1960s, but we respectfully disagree with its approach to interpreting Title VII as well as its conclusion that sexual orientation discrimination is not a "reasonably comparable evil," *Oncale*, 523 U.S. at 79, to sexual harassment and male-on-male harassment. Although legislative history most certainly has its uses, in ascertaining statutory meaning in a Title VII case, *Oncale* specifically rejects reliance on "the principal concerns of our legislators," *id.* at 79–80—the centerpiece of the dissent's statutory analysis. Rather, *Oncale* instructs that the text is the lodestar of statutory interpretation, emphasizing that we are governed "by the provisions of our laws." *Id.* The text before us uses broad language, prohibiting discrimination "because of . . . sex," which Congress defined as making sex "a motivating factor." 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m). We give these words their full scope and conclude that, because sexual orientation discrimination is a function of sex, and is comparable to sexual

28

harassment, gender stereotyping, and other evils long recognized as violating

Title VII, the statute must prohibit it.[11]

### b.    "But for" an Employee's Sex

Our conclusion is reinforced by the Supreme Court's test for determining

whether an employment practice constitutes sex discrimination. This approach,

which we call the "comparative test," determines whether the trait that is the

basis for discrimination is a function of sex by asking whether an employee's

treatment would have been different "but for that person's sex." *Manhart*, 435

U.S. at 711 (internal quotation marks omitted). To illustrate its application to

sexual orientation, consider the facts of the recent Seventh Circuit case

addressing a Title VII claim brought by Kimberly Hively, a lesbian professor

who alleged that she was denied a promotion because of her sexual orientation.

*Hively*, 853 F.3d at 341 (majority). Accepting that allegation as true at the motion-

to-dismiss stage, the Seventh Circuit compared Hively, a female professor

---

[11] This holding is easily operationalized. A standard jury instruction in a Title VII case alleging sex discrimination informs the jury that a plaintiff has the burden of proving, by a preponderance of the evidence, that the defendant intentionally discriminated against the plaintiff because of sex, meaning that the plaintiff's sex was a motivating factor in the defendant's decision to take the alleged adverse employment action against the plaintiff. *See* 42 U.S.C. §§ 2000e-2(a)(1), 2000e-2(m). In a case alleging sexual orientation discrimination under

attracted to women (who was denied a promotion), with a hypothetical scenario in which Hively was a male who was attracted to women (and received a promotion). *Id.* at 345. Under this scenario, the Seventh Circuit concluded that, as alleged, Hively would not have been denied a promotion but for her sex, and therefore sexual orientation is a function of sex. From this conclusion, it follows that sexual orientation discrimination is a subset of sex discrimination. *Id.*

The government,[12] drawing from the dissent in *Hively*, argues that this is an improper comparison. According to this argument, rather than "hold[ing] everything constant except the plaintiff's sex" the *Hively* majority's comparison changed "two variables—the plaintiff's sex and sexual orientation." 853 F.3d at 366 (Sykes, *J.*, dissenting). In other words, the Seventh Circuit compared a lesbian woman with a heterosexual man. As an initial matter, this observation helpfully illustrates that sexual orientation is a function of sex. In the comparison, changing Hively's sex changed her sexual orientation. Case in point.

---

Title VII, an instruction should add that "because of sex" includes actions taken because of sexual orientation.

[12] Both the Department of Justice and the EEOC have filed *amicus* briefs in this case, the former in support of defendants and the latter in support of Zarda. Because EEOC attorneys represent only the Commission, 42 U.S.C. § 2000e-4(b)(2), while the Department of Justice has litigating authority on behalf of the United States, 28 U.S.C. § 517, this opinion refers to the Department of Justice as "the government."

But the real issue raised by the government's critique is the proper

application of the comparative test. In the government's view, the appropriate

comparison is not between a woman attracted to women and a man attracted to

women; it's between a woman and a man, both of whom are attracted to people

of the same sex. Determining which of these framings is correct requires

understanding the purpose and operation of the comparative test. Although the

Supreme Court has not elaborated on the role that the test plays in Title VII

jurisprudence, based on how the Supreme Court has employed the test, we

understand that its purpose is to determine when a trait other than sex is, in fact,

a proxy for (or a function of) sex. To determine whether a trait is such a proxy,

the test compares a female and a male employee who both exhibit the trait at

issue. In the comparison, the trait is the control, sex is the independent variable,

and employee treatment is the dependent variable.

To understand how the test works in practice, consider *Manhart*. There, the

Supreme Court evaluated the Los Angeles Department of Water's requirement

that female employees make larger pension contributions than their male

colleagues. 435 U.S. at 704–05. This requirement was based on mortality data

indicating that female employees outlived male employees by several years and

31

the employer insisted that "the different contributions exacted from men and women were based on the factor of longevity rather than sex." *Id.* at 712. Applying "the simple test of whether the evidence shows treatment of a person in a manner which *but for* that person's sex would be different," the Court compared a woman and a man, both of whose pension contributions were based on life expectancy, and asked whether they were required to make different contributions. *Id.* at 711 (internal quotation marks omitted). Importantly, because life expectancy is a sex-dependent trait, changing the sex of the employee (the independent variable) necessarily affected the employee's life expectancy and thereby changed how they were impacted by the pension policy (the dependent variable). After identifying this correlation, the Court concluded that life expectancy was simply a proxy for sex and therefore the pension policy constituted discrimination "because of . . . sex." *Id.*

We can also look to the Supreme Court's decision in *Price Waterhouse.* Although that case did not quote *Manhart*'s "but for" language, it involved a similar inquiry: in determining whether discrimination based on particular traits was rooted in sex stereotypes, the Supreme Court asked whether a female accountant would have been denied a promotion based on her aggressiveness

and failure to wear jewelry and makeup "if she had been a man." 490 U.S. at 258. Otherwise said, the Supreme Court compared a man and a woman who exhibited the plaintiff's traits and asked whether they would have experienced different employment outcomes. Notably, being aggressive and not wearing jewelry or makeup is consistent with gender stereotypes for men. Therefore, by changing the plaintiff's gender, the Supreme Court also changed the plaintiff's gender non-conformity.

The government's proposed approach to *Hively*, which would compare a woman attracted to people of the same sex with a man attracted to people of the same sex, adopts the wrong framing. To understand why this is incorrect, consider the mismatch between the facts in the government's comparison and the allegation at issue: Hively did not allege that her employer discriminated against women with same-sex attraction but not men with same-sex attraction. If she had, that would be classic sex discrimination against a subset of women. *See* Lead Dissent at 37 n.20. Instead, Hively claimed that her employer discriminated on the basis of sexual orientation. To address that allegation, the proper question is whether sex is a "motivating factor" in sexual orientation discrimination, *see* 42 U.S.C. § 2000e-2(m), or, said more simply, whether sexual orientation is a

function of sex.[13] But, contrary to the government's suggestion, this question cannot be answered by comparing two people with the same sexual orientation. That would be equivalent to comparing the gender non-conforming female plaintiff in *Price Waterhouse* to a gender non-conforming man; such a comparison would not illustrate whether a particular stereotype is sex dependent but only whether the employer discriminates against gender non-conformity in only one gender. Instead, just as *Price Waterhouse* compared a gender non-conforming woman to a gender conforming man, both of whom were aggressive and did not wear makeup or jewelry, the *Hively* court properly determined that sexual orientation is sex dependent by comparing a woman and a man with two different sexual orientations, both of whom were attracted to women.

The government further counters that the comparative test produces false positives in instances where it is permissible to impose different terms of employment on men and women because "the sexes are not similarly situated."

---

[13] The lead dissent trivializes the role of sex as a motivating factor by suggesting that an employer who discriminates on the basis of sexual orientation is merely "noticing" an employee's gender. Lead Dissent at 46. This argument, which implies that an employee's sexual orientation is the primary motivating factor while his or her sex is merely collateral, cannot be squared with the Supreme Court's case law. For example, in *Manhart*, the employer's argument that it was motivated by employee's life expectancy could not save its policy because,

Gov. Br. at 16–17 (quoting *Michael M. v. Superior Court of Sonoma Cty.*, 450 U.S. 464, 469 (1981)).[14] For example, the government posits that courts have rejected the comparative test when assessing employer policies regarding sex-segregated bathrooms and different grooming standards for men and women. Similarly, the lead dissent insists that our holding would preclude such policies if "[t]aken to its logical conclusion." Lead Dissent at 35. Both criticisms are misplaced.

A plaintiff alleging disparate treatment based on sex in violation of Title VII must show two things: (1) that he was "discriminate[d] against . . . with respect to his compensation, terms, conditions, or privileges of employment," and (2) that the employer discriminated "because of . . . sex." 42 U.S.C. § 2000e-2(a)(1). The comparative test addresses the second prong of that test; it reveals whether an employment practice is "because of . . . sex" by asking whether the

---

irrespective of the employer's intention or what it claimed to notice, life expectancy was a function of sex. 435 U.S. at 712–13.

[14] Ironically, the quoted language from *Michael M.* references instances where men and women are differently situated *because of the discrimination* borne by women—the fact that they are assigned parental responsibility at the moment an infant is born, are generally paid less than men, and are excluded from positions that are necessary for subsequent promotions. 450 U.S. at 469 (collecting cases reflecting "the special problems of women" (internal quotation marks omitted)). The *Michael M.* Court acknowledged that, when the sexes are not similarly situated because of discrimination, statutes may impose different standards in the interest of leveling the playing field. *Id.* However, Title VII commands equal treatment of sexes and neither the text of the statute nor *Michael M.* creates an exception permitting employers to engage in disparate

trait at issue (life expectancy, sexual orientation, etc.) is a function of sex. In contrast, courts that have addressed challenges to the sex-specific employment practices identified by the government have readily acknowledged that the policies are based on sex and instead focused their analysis on the first prong: whether the policies impose "disadvantageous terms or conditions of employment."[15] *Harris*, 510 U.S. at 25 (Ginsburg, *J.*, concurring)*; see, e.g., Jespersen v. Harrah's Operating Co.*, 444 F.3d 1104, 1109–10 (9th Cir. 2006) (upholding grooming standards that do not "place[] a greater burden on one gender than the other"); *Knott v. Mo. Pac. R.R. Co.*, 527 F.2d 1249, 1252 (8th Cir. 1975) (concluding that "slight differences in the appearance requirements for males and females have only a negligible effect on employment opportunities"); *Willingham v. Macon Tel. Publ'g Co.*, 507 F.2d 1084, 1092 (5th Cir. 1975) (same); *Dodge v. Giant Food, Inc.*, 488 F.2d 1333, 1336–37 (D.C. Cir. 1973) (holding that hair-length regulations, like "the requirement that men and women use separate toilet

---

treatment of men and women simply because they exhibit biological differences.

[15] As alleged, Zarda's termination was plainly an adverse employment action that is covered by Title VII. *See* 42 U.S.C. § 2000e-2(a)(1) ("It shall be an unlawful employment practice for an employer . . . to discharge . . . any individual because of such individual's . . . sex . . . .").

facilities[,] . . . do not pose distinct employment disadvantages for one sex").[16]

Whether sex-specific bathroom and grooming policies impose disadvantageous terms or conditions is a separate question from this Court's inquiry into whether sexual orientation discrimination is "because of . . . sex," and has no bearing on the efficacy of the comparative test.

Having addressed the proper application of the comparative test, we conclude that the law is clear: To determine whether a trait operates as a proxy for sex, we ask whether the employee would have been treated differently "but for" his or her sex. In the context of sexual orientation, a woman who is subject to an adverse employment action because she is attracted to women would have been treated differently if she had been a man who was attracted to women. We can therefore conclude that sexual orientation is a function of sex and, by extension, sexual orientation discrimination is a subset of sex discrimination.[17]

---

[16] Arguably this approach is consistent with the Supreme Court's analysis in *Oncale*, which, after acknowledging that male-on-male harassment can be "because of . . . sex," qualified that not all remarks with "sexual content or connotations" rise to the level of discrimination. 523 U.S. at 79–80.

[17] The lead dissent argues that this conclusion is out of sync with precedents prohibiting sexual harassment and hostile work environments because, while those cases addressed particular employment "practice[s]," today's decision extends protection to "an entirely different category of people." Lead Dissent at 22. But "persons discriminated against based on sexual orientation" is no more a new category than "persons discriminated against based on

## 2. Gender Stereotyping

Viewing the relationship between sexual orientation and sex through the lens of gender stereotyping provides yet another basis for concluding that sexual orientation discrimination is a subset of sex discrimination. Specifically, this framework demonstrates that sexual orientation discrimination is almost invariably rooted in stereotypes about men and women.

Since 1978, the Supreme Court has recognized that "employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females," because Title VII "strike[s] at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Manhart*, 435 U.S. at 707 & n.13. This is true of stereotypes about both how the sexes are and how they should be. *Price Waterhouse*, 490 U.S. at 250 ("[A]n employer who acts on the basis of a belief that a woman cannot . . . or must not [possess certain traits] has acted on the basis of gender."); *see also* Zachary R. Herz, Note, Price*'s Progress: Sex Stereotyping and Its Potential for Antidiscrimination Law*, 124 Yale L.J. 396, 405–06 (2014) (distinguishing between ascriptive stereotypes that "treat[] a

gender stereotypes." In both instances, a man or woman is discriminated against based on a trait that is a function of sex and their claims fall squarely within the ambit of a well-recognized

large group of people alike" and prescriptive stereotypes that speak to how members of a group should be).

In *Price Waterhouse*, the Supreme Court concluded that adverse employment actions taken based on the belief that a female accountant should walk, talk, and dress femininely constituted impermissible sex discrimination. *See* 490 U.S. at 250–52 (plurality); *see also id*. at 259 (White, *J.*, concurring in the judgment); *id*. at 272–73 (O'Connor, *J.*, concurring in the judgment).[18] Similarly, *Manhart* stands for the proposition that "employment decisions cannot be predicated on mere 'stereotyped' impressions about the characteristics of males or females," and held that female employees could not, by virtue of their status as women, be discriminated against based on the gender stereotype that women generally outlive men. 435 U.S. at 707–08, 711. Under these principles, employees

---

category: "persons discriminated against based on sex."

[18] One *amicus* and the lead dissent interpret dicta in *Price Waterhouse* as establishing that sex stereotyping is discriminatory only when it pertains to traits that are required for the employee's job. *See* 490 U.S. at 251 (observing that "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not"). We think this narrow reading is an inaccurate statement of *Price Waterhouse*, which did not indicate that stereotyping is impermissible *only* when the stereotyped trait is required for the plaintiff's job, and it is directly contradicted by *Manhart*'s holding that discriminating against women based on their longer life expectancy, which was certainly not an employment requirement, violated Title VII. 435 U.S. at 710–11.

who experience adverse employment actions as a result of their employer's generalizations about members of their sex, *id.* at 708, or "as a result of their employer's animus toward their exhibition of behavior considered to be stereotypically inappropriate for their gender may have a claim under Title VII," *Dawson*, 398 F.3d at 218.

Accepting that sex stereotyping violates Title VII, the "crucial question" is "[w]hat constitutes a gender-based stereotype." *Back*, 365 F.3d at 119–20. As demonstrated by *Price Waterhouse*, one way to answer this question is to ask whether the employer who evaluated the plaintiff in "sex-based terms would have criticized her as sharply (or criticized her at all) if she had been a man." 490 U.S. at 258. Similarly, this Court has observed that the question of whether there has been improper reliance on sex stereotypes can sometimes be answered by considering whether the behavior or trait at issue would have been viewed more or less favorably if the employee were of a different sex. *See Back*, 365 F.3d at 120 n.10 (quoting *Doe ex rel. Doe v. City of Belleville,* 119 F.3d 563, 581–82 (7th Cir. 1997)).[19]

---

[19] In this respect, discerning whether a stereotype is based on sex is closely aligned with the comparative test articulated in *Manhart*, which can illustrate both (1) whether a trait is a

Applying *Price Waterhouse*'s reasoning to sexual orientation, we conclude that when, for example, "an employer . . . acts on the basis of a belief that [men] cannot be [attracted to men], or that [they] must not be," but takes no such action against women who are attracted to men, the employer "has acted on the basis of gender." *Cf.* 490 U.S. at 250.[20] This conclusion is consistent with *Hively*'s holding that same-sex orientation "represents the ultimate case of failure to conform" to gender stereotypes, 853 F.3d at 346 (majority), and aligns with numerous district courts' observation that "stereotypes about homosexuality are directly related to our stereotypes about the proper roles of men and women. . . . The gender stereotype at work here is that 'real' men should date women, and not other men," *Centola v. Potter*, 183 F. Supp. 2d 403, 410 (D. Mass. 2002); *see also, e.g.,*

---

function of sex and (2) whether assumptions about that trait reflect a gender stereotype.

[20] Some *amici* insist that stereotypes are mere evidence of discrimination and that stereotyping does not, by itself, constitute sex discrimination. Beyond establishing an adverse employment action, a Title VII plaintiff must always adduce evidence that an employer discriminated "because of" a protected trait and the Court agrees that sex stereotyping is legally relevant as "evidence that gender played a part" in a particular employment decision. *Price Waterhouse*, 490 U.S. at 251 (emphasis omitted). But, *Price Waterhouse*'s reference to the evidentiary value of stereotyping in no way undercuts it conclusion that an employer may not "evaluate employees by assuming or insisting that they match[] the stereotype associated with their group." *Id.* And, just as the Supreme Court concluded that "an employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender," *id.* at 250, this Court concludes that an employer who acts on the basis of a belief that an employee cannot or should not have a particular sexual orientation has acted on the basis of sex.

*Boutillier v. Hartford Pub. Sch.*, 221 F. Supp. 3d 255, 269 (D. Conn. 2016); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015); *Terveer v. Billington*, 34 F. Supp. 3d 100, 116 (D.D.C. 2014); *Heller v. Columbia Edgewater Country Club*, 195 F. Supp. 2d 1212, 1224 (D. Or. 2002).[21]

This conclusion is further reinforced by the unworkability of *Simonton* and *Dawson*'s holding that sexual orientation discrimination is not a product of sex stereotypes. Lower courts operating under this standard have long labored to distinguish between gender stereotypes that support an inference of impermissible sex discrimination and those that are indicative of sexual orientation discrimination. *See generally Hively v. Ivy Tech Cmty. Coll., S. Bend*, 830 F.3d 698, 705–09 (7th Cir. 2016) (panel op.) (collecting cases), *vacated by Hively*, 853 F.3d 339 (en banc). Under this approach "a woman might have a Title VII claim if she was harassed or fired for being perceived as too 'macho' but not if she was harassed or fired for being perceived as a lesbian." *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 524 n.8 (D. Conn. 2016). In parsing the evidence,

---

[21] The Sixth Circuit has expressed the same observation, albeit in a decision declining to apply *Price Waterhouse* to sexual orientation discrimination. *See Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 764 (6th Cir. 2006) ("[A]ll homosexuals, by definition, fail to conform to traditional gender norms in their sexual practices.").

courts have resorted to lexical bean counting, comparing the relative frequency of epithets such as "ass wipe," "fag," "gay," "queer," "real man," and "fem" to determine whether discrimination is based on sex or sexual orientation. *See, e.g.,* *Kay v. Indep. Blue Cross*, 142 F. App'x 48, 51 (3d Cir. 2005). Claims of gender discrimination have been "especially difficult for gay plaintiffs to bring," *Maroney v. Waterbury Hosp.*, No. 3:10-CV-1415, 2011 WL 1085633, at *2 n.2 (D. Conn. Mar. 18, 2011), because references to a plaintiff's sexual orientation are generally excluded from the evidence, *Boutillier*, 221 F. Supp. 3d at 269, or permitted only when "the harassment consists of homophobic slurs directed at a *heterosexual*," *Estate of D.B. by Briggs v. Thousand Islands Cent. Sch. Dist.*, 169 F. Supp. 3d 320, 332–33 (N.D.N.Y. 2016) (emphasis added). *But see Franchina*, 881 F.3d at 53 (holding that jury may consider evidence referencing plaintiff's sexual orientation for purposes of a sex discrimination claim). Unsurprisingly, many courts have found these distinctions unworkable, admitting that the doctrine is "illogical," *Philpott v. New York*, No. 1:16-CV-6778, 2017 WL 1750398, at *2 (S.D.N.Y. May 3, 2017), and produces "untenable results," *Boutillier*, 221 F. Supp. 3d at 270. In the face of this pervasive confusion, we are persuaded that "the line between sex discrimination and sexual orientation discrimination is 'difficult to

draw' because that line does not exist save as a lingering and faulty judicial construct." *Videckis*, 150 F. Supp. 3d at 1159 (quoting *Prowel*, 579 F.3d at 291). We now conclude that sexual orientation discrimination is rooted in gender stereotypes and is thus a subset of sex discrimination.

The government resists this conclusion, insisting that negative views of those attracted to members of the same sex may not be based on views about gender at all, but may be rooted in "moral beliefs about sexual, marital and familial relationships." Gov. Br. at 19. But this argument merely begs the question by assuming that moral beliefs about sexual orientation can be dissociated from beliefs about sex. Because sexual orientation is a function of sex, this is simply impossible. Beliefs about sexual orientation necessarily take sex into consideration and, by extension, moral beliefs about sexual orientation are necessarily predicated, in some degree, on sex. For this reason, it makes no difference that the employer may not believe that its actions are based in sex. In *Manhart*, for example, the employer claimed its policy was based on longevity, not sex, but the Supreme Court concluded that, irrespective of the employer's belief, the longevity metric was predicated on assumptions about sex. 435 U.S. at 712–13. The same can be said of sexual orientation discrimination.

To be clear, our conclusion that moral beliefs regarding sexual orientation are based on sex does not presuppose that those beliefs are necessarily animated by an invidious or evil motive. For purposes of Title VII, any belief that depends, even in part, on sex, is an impermissible basis for employment decisions.[22] This is true irrespective of whether the belief is grounded in fact, as in *Manhart*, *id.* at 704–05, 711, or lacks "a malevolent motive," *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991). Indeed, in *Johnson Controls*, the Supreme Court concluded that an employer violated Title VII by excluding fertile women from jobs that involved exposure to high levels of lead, which can adversely affect the development of a fetus. 499 U.S. at 190, 200. As the Court emphasized, "[t]he beneficence of an employer's purpose does not undermine the conclusion that an explicit gender-based policy is sex discrimination" under Title VII. *Id.* at 200. Here, because sexual orientation is a function of sex, beliefs about sexual orientation, including moral ones, are, in some measure, "because of . . . sex."

---

[22] We express no view on whether some exception, either under a different provision of Title VII or under the Religious Freedom Restoration Act, might immunize from liability discriminatory conduct rooted in religious beliefs.

The government responds that, even if discrimination based on sexual orientation reflects a sex stereotype, it is not barred by *Price Waterhouse* because it treats women no worse than men.[23] Gov. Br. at 19–20. We believe the government has it backwards. *Price Waterhouse*, read in conjunction with *Oncale*, stands for the proposition that employers may not discriminate against women or men who fail to conform to conventional gender norms. *See Oncale*, 523 U.S. at 78 (holding that Title VII "protects men as well as women"); *Price Waterhouse*, 490 U.S. at 251 ("We are beyond the day when an employer could evaluate employees by assuming or insisting that they matched the stereotype associated with their

---

[23] The lead dissent offers a variation on this argument, reasoning that prescriptive views about sexual orientation rest not on "a belief about what men or women ought to be or do," but "a belief about what *all* people ought to be or do," Lead Dissent at 52, which is to say, a belief that all people should be attracted to the opposite sex. *See also Hively*, 853 F.3d at 370 (Sykes, *J.*, dissenting) ("To put the matter plainly, heterosexuality is not a female stereotype; it is not a male stereotype; it is not a sex-specific stereotype at all."). It invokes the same idea when it contends that sexual orientation discrimination is not a function of sex because it "does not differentially disadvantage employees or applicants of either sex." Lead Dissent at 37. We think the dissent goes astray by getting off on the wrong foot. The dissent views the "key element" as whether "one sex is systematically disadvantaged in a particular workplace." *Id.* at 51. But Title VII does not ask whether a particular sex is discriminated against; it asks whether a particular "*individual*" is discriminated against "because of such *individual's* . . . sex." *See* 42 U.S.C. § 2000e-2(a)(1) (emphasis added); *see also Manhart*, 435 U.S. at 708 ("The statute's focus on the individual is unambiguous."). Taking individuals as the unit of analysis, the question is not whether discrimination is borne only by men or only by women or even by both men and women; instead, the question is whether an individual is discriminated against because of his or her sex. And this means that a man and a woman are both entitled to protection from the same type of discrimination, provided that in each instance the discrimination is "because of such

46

group."). It follows that the employer in *Price Waterhouse* could not have defended itself by claiming that it fired a gender-non-conforming man as well as a gender-non-conforming woman any more than it could persuasively argue that two wrongs make a right. To the contrary, this claim would merely be an admission that the employer has doubly violated Title VII by using gender stereotypes to discriminate against both men and women. By the same token, an employer who discriminates against employees based on assumptions about the gender to which the employees can or should be attracted has engaged in sex-discrimination irrespective of whether the employer uses a double-edged sword that cuts both men and women.[24]

---

individual's . . . sex." As we have endeavored to explain, sexual orientation discrimination is because of sex.

[24] The *Hively* dissent also argued that sexual orientation discrimination is not a form of sex discrimination because it does not discriminate comprehensively *within* a sex. In particular, the dissent suggested that in cases where a fired lesbian employee was replaced by a heterosexual woman a jury would not be able to understand that sexual orientation discrimination is a subset of sex discrimination. *See* 853 F.3d at 373. We think that jurors are capable of understanding that an employer might discriminate against some members of a sex but not others. To wit, the intuitive principle that "Title VII does not permit the victim of [discrimination] to be told that he [or she] has not been wronged because other persons of his or her race or sex were hired" is well established in the law. *Connecticut v. Teal*, 457 U.S. 440, 455 (1982). By way of illustration, had the plaintiff in *Price Waterhouse* been denied a promotion while a gender-conforming woman was made a partner, this would have strengthened rather than weakened the plaintiff's case that she was discriminated against for failing to conform to sex stereotypes. We see no more difficulty with the concept that an employer cannot

### 3. Associational Discrimination

The conclusion that sexual orientation discrimination is a subset of sex discrimination is further reinforced by viewing this issue through the lens of associational discrimination. Consistent with the nature of sexual orientation, in most contexts where an employer discriminates based on sexual orientation, the employer's decision is predicated on opposition to romantic association between particular sexes. For example, when an employer fires a gay man based on the belief that men should not be attracted to other men, the employer discriminates based on the employee's own sex. *See Baldwin*, 2015 WL 4397641, at *6.

This Court recognized associational discrimination as a violation of Title VII in *Holcomb v. Iona College*, 521 F.3d 130, 139 (2d Cir. 2008), a case involving allegations of racial discrimination. Holcomb, a white man, alleged that he was fired from his job as the assistant coach of a college basketball team because his employer disapproved of his marriage to a black woman. This Court concluded that Holcomb had stated a viable claim, holding that "an employer may violate Title VII if it takes action against an employee because of the employee's

---

discriminate on the basis of sexual orientation than with the concept that one cannot discriminate based on an employee's gender non-conformity.

association with a person of another race." *Id.* at 138. Although the Court

considered the argument that the alleged discrimination was based on the race of

Holcomb's wife rather than his own, it ultimately concluded that "where an

employee is subjected to adverse action because an employer disapproves of

interracial association, the employee suffers discrimination because of the

employee's *own* race." *Id.* at 139; *see also Whitney v. Greater N.Y. Corp. of Seventh*

*Day Adventists,* 401 F. Supp. 1363, 1366 (S.D.N.Y. 1975) ("[I]f [plaintiff] was

discharged because, as alleged, the defendant disapproved of a social

relationship between a white woman and a black man, the plaintiff's race was as

much a factor in the decision to fire her as that of her friend.").

Applying similar reasoning, the Fifth, Sixth, and Eleventh Circuits have

reached the same conclusion in racial discrimination cases. *See Tetro v. Elliott*

*Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 994–95 (6th

Cir. 1999) (holding that plaintiff had alleged discrimination where the employer

was "charged with reacting adversely to [plaintiff] because of [his] race in

relation to the race of his daughter"); *Deffenbaugh-Williams v. Wal-Mart Stores,*

*Inc.*, 156 F.3d 581, 589 (5th Cir. 1998) ("[A] reasonable juror could find that

[plaintiff] was discriminated against because of her race (white), if that

discrimination was premised on the fact that she, a white person, had a relationship with a black person."), *vacated in part on other grounds by Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) (en banc); *Parr v. Woodmen of the World Life Ins. Co.*, 791 F.2d 888, 892 (11th Cir. 1986) ("Where a plaintiff claims discrimination based upon an interracial marriage or association, he alleges, by definition, that he has been discriminated against because of *his* race."). Other circuits have indicated that associational discrimination extends beyond race to all of Title VII's protected classes. *See Hively*, 853 F.3d at 349 (majority) (holding that Title VII prohibits associational discrimination on the basis of race as well as color, national origin, religion, and sex); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009) (stating, in the context of a race discrimination case, that "Title VII protects individuals who, though not members of a *protected class*, are victims of discriminatory animus toward protected third persons with whom the individuals associate" (internal quotation marks omitted) (emphasis added)).[25]

---

[25] In addition, numerous district courts throughout the country have recognized that employers violate Title VII when they discriminate against employees on the basis of association with people of another national origin or sex, not only with people of another race. *See, e.g.*, *Montes v. Cicero Pub. Sch. Dist. No. 99*, 141 F. Supp. 3d 885, 900 (N.D. Ill. 2015) (national origin); *Morales v. NYS Dep't of Labor*, 865 F. Supp. 2d 220, 242–43 (N.D.N.Y. 2012), *aff'd*, 530 F. App'x 13 (2d Cir. 2013) (summary order) (race and national origin); *Kauffman v. Maxim Healthcare Servs., Inc.*, No. 04-CV-2869, 2006 WL 1983196, at *4 (E.D.N.Y. July 13, 2006) (sex and

We agree and we now hold that the prohibition on associational discrimination applies with equal force to all the classes protected by Title VII, including sex.

This conclusion is consistent with the text of Title VII, which "on its face treats each of the enumerated categories exactly the same" such that "principles . . . announce[d]" with respect to sex discrimination "apply with equal force to discrimination based on race, religion, or national origin," and vice versa.[26] *Price Waterhouse*, 490 U.S. at 243 n.9. It also accords with the Supreme Court's application of theories of discrimination developed in Title VII race discrimination cases to claims involving discrimination based on sex. *See Meritor*, 477 U.S. at 63–67 (concluding that claims of hostile work environment, a theory of discrimination developed in the context of race, were equally applicable in the context of sex); *see also* William N. Eskridge, Jr., *Title VII's Statutory History and the Sex Discrimination Argument for LGBT Workplace Protections*, 127 Yale L.J. 322, 349 (2017) (explaining that the 1972 amendments to Title VII "repeatedly equated the evils of sex discrimination with those of race discrimination").

---

race); *Reiter v. Ctr. Consol. Sch. Dist. No. 26-JT*, 618 F. Supp. 1458, 1460 (D. Colo. 1985) (race and national origin).

[26] The only exception, not relevant here, is for a "bona fide occupational qualification," which permits some differential treatment based on religion, sex, or national origin, but not

As was observed in *Christiansen*, "[p]utting aside romantic associations," the notion that employees should not be discriminated against because of their association with persons of a particular sex "is not controversial." 852 F.3d at 204 (Katzmann, *C.J.*, concurring). If an employer disapproves of close friendships among persons of opposite sexes and fires a female employee because she has male friends, the employee has been discriminated against because of her own sex. "Once we accept this premise, it makes little sense to carve out same-sex [romantic] relationships as an association to which these protections do not apply." *Id.* Applying the reasoning of *Holcomb*, if a male employee married to a man is terminated because his employer disapproves of same-sex marriage, the employee has suffered associational discrimination based on his own sex because "the fact that the employee is a man instead of a woman motivated the employer's discrimination against him." *Baldwin*, 2015 WL 4397641, at *6.

In this scenario, it is no defense that an employer requires both men and women to refrain from same-sex attraction or relationships. In *Holcomb*, for example, the white plaintiff was fired for his marriage to a black woman. *See* 521 F.3d at 138. If the facts of *Holcomb* had also involved a black employee fired for

based on race. 42 U.S.C. § 2000e-2(e).

his marriage to a white woman, would we have said that because both the white employee and black employee were fired for their marriages to people of different races, there was no discrimination "because of . . . race"? Of course not.[27] It is unthinkable that "tak[ing] action against an employee because of the employee's association with a person of another race," *id*. at 139, would be excused because two employees of different races were both victims of an anti-miscegenation workplace policy. The same is true of discrimination based on sexual orientation.[28]

Although this conclusion can rest on its own merits, it is reinforced by the reasoning of *Loving v. Virginia*, 388 U.S. 1 (1967). In *Loving*, the Commonwealth of Virginia argued that anti-miscegenation statutes did not violate the Equal

---

[27] Indeed, if this were the case, the white employee *and* the black employee would have cognizable Title VII claims. *Cf. Hively*, 853 F.3d at 359 n.2 (Flaum, *J.*, concurring) (noting that "even if an employer allegedly discriminates against all homosexual employees," the "employer's discrimination across sexes does not demonstrate that sex is irrelevant, but rather that *each individual* has a plausible sex-based discrimination claim" (emphasis added)).

[28] The lead dissent seeks to distinguish *Holcomb* by arguing that the employer in *Holcomb* was prejudiced against black people, whereas here the employer is "hostile to gay men, not men in general." Lead Dissent at 57. But, this distorts the comparison by misattributing the prejudice at issue in *Holcomb*. The basis of the Title VII claim in *Holcomb* was not the race of the plaintiff's wife; rather, the plaintiff, who was white, "suffer[ed] discrimination because of his *own* race" as a result of the employer's "disapprov[al] of interracial association." 521 F.3d at 139. Accordingly, the prejudice was not against all black people (or all white people) but against people marrying persons of a different race. That maps squarely onto this case where the prejudice is not against all men, but people being attracted to persons of the same sex.

53

Protection Clause because such statutes applied equally to white and black citizens. *See id*. at 7–8. The Supreme Court disagreed, holding that "equal application" could not save the statute because it was based "upon distinctions drawn according to race." *Id.* at 10–11. Constitutional cases like *Loving* "can provide helpful guidance in [the] statutory context" of Title VII. *Ricci v. DeStefano*, 557 U.S. 557, 582 (2009); *see also* Reva B. Siegel, *She the People: The Nineteenth Amendment, Sex Equality, Federalism, and the Family*, 115 Harv. L. Rev. 947, 949 (2002) (arguing that, in the constitutional context, "the Supreme Court developed the law of sex discrimination by means of an analogy between sex and race discrimination"). Accordingly, we find that *Loving*'s insight—that policies that distinguish according to protected characteristics cannot be saved by equal application—extends to association based on sex.

Certain *amici* supporting the defendants disagree, arguing that applying *Holcomb* and *Loving* to same-sex relationships is not warranted because anti-miscegenation policies are motivated by racism, while sexual orientation discrimination is not rooted in sexism. Although these *amici* offer no empirical support for this contention, *amici* supporting Zarda cite research suggesting that sexual orientation discrimination has deep misogynistic roots. *See, e.g.*, Andrew

Koppelman, *Why Discrimination Against Lesbians and Gay Men is Sex*

*Discrimination*, 69 N.Y.U. L. Rev. 197 (1994). But the Court need not resolve this

dispute because the *amici* supporting defendants identify no cases indicating that

the scope of Title VII's protection against sex discrimination is limited to

discrimination motivated by what would colloquially be described as sexism. To

the contrary, this approach is squarely foreclosed by the Supreme Court's

precedents. In *Oncale*, the Court explicitly rejected the argument that Title VII did

not protect male employees from sexual harassment by male co-workers, holding

that "Title VII's prohibition on discrimination 'because of . . . sex' protects men as

well as women" and extends to instances where the "plaintiff and the defendant

. . . are of the same sex." 523 U.S. at 78–79. This male-on-male harassment is well-

outside the bounds of what is traditionally conceptualized as sexism. Similarly,

as we have discussed, in *Manhart* the Court invalidated a pension scheme that

required female employees to contribute more than their male counterparts

because women generally live longer than men. 435 U.S. at 711. Again, the Court

reached this conclusion notwithstanding the fact that some people might not

describe this policy as sexist. By extension, even if sexual orientation

discrimination does not evince conventional notions of sexism, this is not a

legitimate basis for concluding that it does not constitute discrimination "because of . . . sex."[29]

The fallback position for those opposing the associational framework is that associational discrimination can be based only on acts—such as Holcomb's act of getting married—whereas sexual orientation is a status. As an initial matter, the Supreme Court has rejected arguments that would treat acts as separate from status in the context of sexual orientation. In *Lawrence v. Texas*, the state argued that its "sodomy law [did] not discriminate against homosexual persons," but "only against homosexual conduct." 539 U.S. 558, 583 (2003) (O'Connor, *J.*, concurring). Justice O'Connor refuted this argument, reasoning that laws that target "homosexual conduct" are "an invitation to subject homosexual persons to discrimination." *Id.* More recently, in a First Amendment case addressing whether a public university could require student organizations to be open to all students, a religious student organization claimed that it should be permitted to exclude anyone who engaged in "unrepentant homosexual

---

[29] To the extent that *amici* are arguing that racism and sexism are necessary elements of a Title VII claim because these beliefs are invidious or malicious, we think their contentions are misguided. Malice, which the Supreme Court has described as an "evil motive," is not required

conduct," because such individuals were being excluded "on the basis of a conjunction of [their] conduct and [their] belief that the conduct is not wrong," not because of their sexual orientation. *Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 672, 689 (2010) (internal quotation marks omitted). Drawing on *Lawrence* and *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), a case brought under 42 U.S.C. § 1985(3), the Supreme Court rejected the invitation to treat discrimination based on acts as separate from discrimination based on status. *Christian Legal Soc.*, 561 U.S. at 689; *see also Bray*, 506 U.S. at 270 (rejecting the act-status distinction by observing that "[a] tax on wearing yarmulkes is a tax on Jews"). Although *amici*'s argument inverts the previous defenses of policies targeting individuals attracted to persons of the same sex by arguing that Title VII's prohibition of associational discrimination protects only acts, not status, their proposed distinction is equally unavailing.

More fundamentally, *amici*'s argument is an inaccurate characterization of associational discrimination. First, the source of the Title VII claim is not the employee's associational act but rather the employer's discrimination, which is

by Title VII, *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 530 (1999); to the contrary, it is merely a basis on which an aggrieved employee may seek punitive damages, *see* 42 U.S.C. § 1981a(b)(1).

57

motivated by "disapprov[al] of [a particular type of] association." *See Holcomb*, 521 F.3d at 139; *see also* 42 U.S.C. § 2000e-2(m) (asking whether the protected trait was "a motivating factor"). In addition, as it pertains to the employee, what is protected is not the employee's act but rather the employee's protected characteristic, which is a status. *Holcomb*, 521 F.3d at 139; *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2522 (2013) (defining "status-based discrimination," which is "prohibited by Title VII," as "discrimination on the basis of race, color, religion, sex, or national origin"). Accordingly, associational discrimination is not limited to acts; instead, as with all other violations of Title VII, associational discrimination runs afoul of the statute by making the employee's protected characteristic a motivating factor for an adverse employment action. *See* 42 U.S.C. § 2000e-2(m).[30]

---

[30] Because associational discrimination is premised on the employer's motivation and an employee's status, an associational discrimination claim does not require an act that consummates an association. For example, consider a scenario in which Holcomb had not been married to a black woman but merely expressed an interest in dating black women. If the employer terminated Holcomb merely on the basis of his desire to date black women, this would still be an instance "where an employee is subjected to adverse action because an employer disapproves of interracial association," and "the employee suffers discrimination because of the employee's *own* race." *Holcomb*, 521 F.3d at 139. The same is true in the context of sexual orientation.

In sum, we see no principled basis for recognizing a violation of Title VII for associational discrimination based on race but not on sex. Accordingly, we hold that sexual orientation discrimination, which is based on an employer's opposition to association between particular sexes and thereby discriminates against an employee based on their own sex, constitutes discrimination "because of . . . sex." Therefore, it is no less repugnant to Title VII than anti-miscegenation policies.

## C. Subsequent Legislative Developments

Although the conclusion that sexual orientation discrimination is a subset of sex discrimination follows naturally from existing Title VII doctrine, the *amici* supporting the defendants place substantial weight on subsequent legislative developments that they argue militate against interpreting "because of . . . sex" to include sexual orientation discrimination.[31] Having carefully considered each of *amici*'s arguments, we find them unpersuasive.

First, the government points to the Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat. 1071 (1991), arguing that this amendment to Title VII ratified

---

[31] Because "[t]he prohibition against discrimination based on sex was added to Title VII at the last minute on the floor of the House of Representatives," we have "little legislative

judicial decisions construing discrimination "because of . . . sex" as excluding

sexual orientation discrimination. Among other things, the 1991 amendment

expressly "codif[ied] the concepts of 'business necessity' and 'job related'" as

articulated in *Griggs*, 401 U.S. at 429–31, and rejected the Supreme Court's prior

decision on that topic in *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989). *See*

Civil Rights Act of 1991 §§ 2(2), 3(2), 105 Stat. at 1071. According to the

government, this amendment also implicitly ratified the decisions of the four

courts of appeals that had, as of 1991, held that Title VII does not bar

discrimination based on sexual orientation.

In advancing this argument, the government attempts to analogize the

1991 amendment to the Supreme Court's recent discussion of an amendment to

the Fair Housing Act ("FHA"). In *Texas Department of Housing & Community*

*Affairs v. Inclusive Communities Project, Inc.*, the Court considered whether

disparate-impact claims were cognizable under the FHA by looking to, *inter alia*,

a 1988 amendment to the statute. 135 S. Ct. 2507 (2015). The Court found it

relevant that "all nine Courts of Appeals to have addressed the question" by

1988 "had concluded [that] the [FHA] encompassed disparate-impact claims." *Id.*

---

history to guide us in interpreting" it. *Meritor*, 477 U.S. at 63–64.

at 2519. When concluding that Congress had implicitly ratified these holdings, the Court considered (1) the amendment's legislative history, which confirmed that "Congress was aware of this unanimous precedent," *id.*, and (2) the fact that the precedent was directly relevant to the amendment, which "included three exemptions from liability that assume the existence of disparate-impact claims," *id.* at 2520.

The statutory history of Title VII is markedly different. When we look at the 1991 amendment, we see no indication in the legislative history that Congress was aware of the circuit precedents identified by the government and, turning to the substance of the amendment, we have no reason to believe that the new provisions it enacted were in any way premised on or made assumptions about whether sexual orientation was protected by Title VII. It is also noteworthy that, when the statute was amended in 1991, only three of the thirteen courts of appeals had considered whether Title VII prohibited sexual orientation discrimination.[32] *See Williamson*, 876 F.2d 69; *DeSantis v. PT&T Co.*, 608 F.2d 327

---

[32] The fourth case cited by the government involved allegations of discrimination against a transgender individual, a distinct question not at issue here. *See Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1084–87 (7th Cir. 1984). In addition, of the three cases actually on point, two predate *Price Waterhouse*, which was decided in May 1989, while the third was issued one month after

(9th Cir. 1979); *Blum*, 597 F.2d 936. Mindful of this important context, this is not an instance where we can conclude that Congress was aware of, much less relied upon, the handful of Title VII cases discussing sexual orientation. Indeed, the inference suggested by the government is particularly suspect given that the text of the 1991 amendment emphasized that it was "respond[ing] to Supreme Court decisions by *expanding* the scope of relevant civil rights statutes in order to provide adequate protection to victims of discrimination." Civil Rights Act of 1991 §§ 2(2), 3(2), 105 Stat. at 1071 (emphasis added). For these reasons, we do not consider the 1991 amendment to have ratified the interpretation of Title VII as excluding sexual orientation discrimination.

Next, certain *amici* argue that by not enacting legislation expressly prohibiting sexual orientation discrimination in the workplace Congress has implicitly ratified decisions holding that sexual orientation was not covered by Title VII. According to the government's *amicus* brief, almost every Congress since 1974 has considered such legislation but none of these bills became law.

---

*Price Waterhouse* but made no mention of it. Given that these cases did not have the opportunity to apply a relevant Supreme Court precedent, even if Congress was aware of them, there was reason for Congress to regard the weight of these cases with skepticism.

This theory of ratification by silence is in direct tension with the Supreme Court's admonition that "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress," particularly when "it concerns, as it does here, a proposal that does not become law." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (citations and internal quotation marks omitted). This is because "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a particular] statutory interpretation." *Patterson v. McLean Credit Union*, 491 U.S. 164, 175 n.1 (1989) (internal quotation marks omitted). After all, "[t]here are many reasons Congress might not act on a decision . . . , and most of them have nothing at all to do with Congress' desire to preserve the decision." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Thomas, *J.*, dissenting). For example, Congress may be unaware of or indifferent to the status quo, or it may be unable "to agree upon how to alter the status quo." *Johnson v. Transp. Agency*, 480 U.S. 616, 672 (1987) (Scalia, *J.*, dissenting). These concerns ring true here. We do not know why Congress did not act and we are thus unable to choose among the various inferences that could be drawn from Congress's inaction on the bills identified by the government. *See LTV Corp.*, 496

U.S. at 659 ("Congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." (internal quotation marks omitted)). Accordingly, we decline to assign congressional silence a meaning it will not bear.

Drawing on the dissent in *Hively*, the government also argues that Congress considers sexual orientation discrimination to be distinct from sex discrimination because it has expressly prohibited sexual orientation discrimination in certain statutes but not Title VII. *See* 853 F.3d at 363–64 (Sykes, *J.*, dissenting). While it is true that Congress has sometimes used the terms "sex" and "sexual orientation" separately, this observation is entitled to minimal weight in the context of Title VII.

The presumptions that terms are used consistently and that differences in terminology denote differences in meaning have the greatest force when the terms are used in "the same act." *See Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007). By contrast, when drafting separate statutes, Congress is far less likely to use terms consistently, *see* Abbe R. Gluck & Lisa Schultz Bressman, *Statutory Interpretation from the Inside—An Empirical Study of Congressional*

*Drafting, Delegation, and the Canons: Part I*, 65 Stan. L. Rev. 901, 936 (2013), and these presumptions are entitled to less force where, as here, the government points to terms used in different statutes passed by different Congresses in different decades. *See* Violence Against Women Reauthorization Act of 2013, Pub L. No. 113-4, § 3(b)(4), 127 Stat. 54, 61 (2013); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 5306(a)(3), 124 Stat. 119, 626 (2010); Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act, Pub. L. No. 111-84, §§ 4704(a)(1)(C), § 4704(a), 123 Stat. 2835, 2837, 2839 (2009); Higher Education Amendments of 1998, Pub. L. No. 105-244, § 486(e)(1)(A), 112 Stat. 1581, 1743 (1998).

Moreover, insofar as the government argues that mention of "sexual orientation" elsewhere in the U.S. Code is evidence that "because of . . . sex" should not be interpreted to include "sexual orientation," our race discrimination jurisprudence demonstrates that this is not dispositive. We have held that Title VII's prohibition on race discrimination encompasses discrimination on the basis of ethnicity, *see Vill. of Freeport v. Barrella*, 814 F.3d 594, 607 (2d Cir. 2016), notwithstanding the fact that other federal statutes now enumerate race and ethnicity separately, *see, e.g.*, 20 U.S.C. § 1092(f)(1)(F)(ii); 42 U.S.C. § 294e-1(b)(2).

The same can be said of sex and sexual orientation because discrimination based on the former encompasses the latter.

In sum, nothing in the subsequent legislative history identified by the *amici* calls into question our conclusion that sexual orientation discrimination is a subset of sex discrimination and is thereby barred by Title VII.

### III. Summary

Since 1964, the legal framework for evaluating Title VII claims has evolved substantially.[33] Under *Manhart*, traits that operate as a proxy for sex are an impermissible basis for disparate treatment of men and women. Under *Price Waterhouse*, discrimination on the basis of sex stereotypes is prohibited. Under *Holcomb*, building on *Loving*, it is unlawful to discriminate on the basis of an employee's association with persons of another race. Applying these precedents to sexual orientation discrimination, it is clear that there is "no justification in the statutory language . . . for a categorical rule excluding" such claims from the

---

[33] We also note that there has been a sea change in the constitutional framework governing same-sex marriage. *See generally Obergefell v. Hodges*, 135 S. Ct. 2584 (2015); *United States v. Windsor*, 133 S. Ct. 2675 (2013). In the wake of this transformation, the intersection of the modern constitutional framework and decades-old precedents regarding sexual orientation discrimination under Title VII created a "paradoxical legal landscape" in which a man could exercise his constitutional right to marry his same-sex partner on Saturday and "then be fired

reach of Title VII. *Oncale*, 523 U.S. at 80; *see also Baldwin*, 2015 WL 4397641, at *9

("Interpreting the sex discrimination prohibition of Title VII to exclude coverage

of lesbian, gay, or bisexual individuals who have experienced discrimination on

the basis of sex inserts a limitation into the text that Congress has not included.").

Title VII's prohibition on sex discrimination applies to any practice in

which sex is a motivating factor. 42 U.S.C. § 2000e-2(m). As explained above,

sexual orientation discrimination is a subset of sex discrimination because sexual

orientation is *defined* by one's sex in relation to the sex of those to whom one is

attracted, making it impossible for an employer to discriminate on the basis of

sexual orientation without taking sex into account. Sexual orientation

discrimination is also based on assumptions or stereotypes about how members

of a particular gender should be, including to whom they should be attracted.

Finally, sexual orientation discrimination is associational discrimination because

an adverse employment action that is motivated by the employer's opposition to

association between members of particular sexes discriminates against an

employee on the basis of sex. Each of these three perspectives is sufficient to

---

on Monday for just that act." *Hively*, 830 F.3d at 714 (majority). This decision frees this circuit's
jurisprudence regarding sexual orientation from that paradox.

support this Court's conclusion and together they amply demonstrate that sexual orientation discrimination is a form of sex discrimination.

Although sexual orientation discrimination is "assuredly not the principal evil that Congress was concerned with when it enacted Title VII," "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils." *Oncale*, 523 U.S. at 80. In the context of Title VII, the statutory prohibition extends to all discrimination "because of . . . sex" and sexual orientation discrimination is an actionable subset of sex discrimination. We overturn our prior precedents to the contrary to the extent they conflict with this ruling. *See Simonton*, 232 F.3d at 35; *Dawson*, 398 F.3d at 218–20.

***

Zarda has alleged that, by "honestly referr[ing] to his sexual orientation," he failed to "conform to the straight male macho stereotype." J.A. 72. For this reason, he has alleged a claim of discrimination of the kind we now hold cognizable under Title VII. The district court held that there was sufficient evidence of sexual orientation discrimination to survive summary judgment on Zarda's state law claims. Even though Zarda lost his state sexual orientation discrimination claim at trial, that result does not preclude him from prevailing

on his federal claim because his state law claim was tried under "a higher standard of causation than required by Title VII." *Zarda*, 855 F.3d at 81. Thus, we hold that Zarda is entitled to bring a Title VII claim for discrimination based on sexual orientation.

## CONCLUSION

Based on the foregoing, we **VACATE** the district court's judgment on the Title VII claim and **REMAND** for further proceedings consistent with this opinion. We **AFFIRM** the judgment of the district court in all other respects.

DENNIS JACOBS, *Circuit Judge, concurring*:

I concur in Parts I and II.B.3 of the opinion of the Court (Associational

Discrimination) and I therefore concur in the result. Mr. Zarda does have a sex

discrimination claim under Title VII based on the allegation that he was fired

because he was a man who had an intimate relationship with another man. I

write separately because, of the several justifications advanced in that opinion, I

am persuaded by one; and as to associational discrimination, the opinion of the

Court says somewhat more than is necessary to justify it. Since a single

justification is sufficient to support the result, I start with associational

discrimination, and very briefly explain thereafter why the other grounds leave

me unconvinced.

## I

Supreme Court law and our own precedents on race discrimination

militate in favor of the conclusion that sex discrimination based on one's choice

of partner is an impermissible basis for discrimination under Title VII. This view

is an extension of existing law, perhaps a cantilever, but not a leap.

First: this Circuit has already recognized associational discrimination as a

Title VII violation. In Holcomb v. Iona Coll., 521 F.3d 130 (2d Cir. 2008), we

1

considered a claim of discrimination under Title VII by a white man who alleged

that he was fired because of his marriage to a black woman.  We held that "an

employer may violate Title VII if it takes action against an employee because of

the employee's association with a person of another race . . . The reason is simple:

where an employee is subjected to adverse action because an employer

disapproves of interracial association, the employee suffers discrimination

because of the employee's *own* race." Id. at 139 (emphasis in original).

Second: the analogy to same-sex relationships is valid because Title VII "on

its face treats each of the enumerated categories exactly the same"; thus

principles announced in regard to sex discrimination "apply with equal force to

discrimination based on race, religion, or national origin."  Price Waterhouse v.

Hopkins, 490 U.S. 228, 243 n.9 (1989) (plurality opinion).  And, presumably, vice

versa.

Third: There is no reason I can see why associational discrimination based

on sex would not encompass association between persons of the same sex.  In

Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998), a case in which a

man alleged same-sex harassment, the Supreme Court stated that Title VII

prohibits "'discriminat[ion] . . . because of . . . sex'" and that Title VII "protects men as well as women." Id. at 79–80.

This line of cases, taken together, demonstrates that discrimination based on same-sex relationships is discrimination cognizable under Title VII notwithstanding that the sexual relationship is homosexual.

Zarda's complaint can be fairly read to allege discrimination based on his relationship with a person of the same sex. The allegation is analogous to the claim in Holcomb, in which a person of one race was discriminated against on the basis of race because he consorted with a person of a different race. In each instance, the basis for discrimination is disapproval and prejudice as to who is permitted to consort with whom, and the common feature is the sorting: one is the mixing of race and the other is the matching of sex.

This outcome is easy to analogize to Loving v. Virginia, 388 U.S. 1 (1967). While Loving was an Equal Protection challenge to Virginia's miscegenation law, the law was held unconstitutional because it impermissibly drew distinctions according to race. Id. at 10–11. In the context of a person consorting with a person of the same sex, the distinction is similarly drawn according to sex, and is therefore unlawful under Title VII.

Amicus Mortara argues that race discrimination aroused by couples of different race is premised on animus against one of the races (based on the idea of white supremacy), and that discrimination against homosexuals is obviously not driven by animus against men or against women.  But it cannot be that the protections of Title VII depend on particular races; there are a lot more than two races, and Title VII likewise protects persons who are multiracial.  Mr. Mortara may identify analytical differences; but to persons who experience the racial discrimination, it is all one.

Mr. Mortara also argues that discrimination based on homosexual acts and relationships is analytically distinct from discrimination against homosexuals, who have a proclivity on which they may or may not act.  Academics may seek to know whether discrimination is illegal if based on same-sex attraction itself: they have jurisdiction over interesting questions, and we do not.  But the distinction is not decisive.  See Christian Legal Soc. Chapter of Univ. of Cal., Hastings Coll. of Law v. Martinez, 561 U.S. 661, 689 (2010) ("Our decisions have declined to distinguish between status and conduct in" the context of sexual orientation.).  In any event, the distinction between act and attraction does not

4

arise in this case because Mr. Zarda's termination was sparked by his avowal of a same-sex relationship.

A ruling based on Mr. Zarda's same-sex relationship resolves this appeal; good craft counsels that we go no further. Much of the rest of the Court's opinion amounts to woke dicta.

## II

The opinion of the Court characterizes its definitional analysis as "the most natural reading of Title VII." Maj. Op. at 21. Not really. "Sex," which is used in series with "race" and "religion," is one of the words least likely to fluctuate in meaning. I do not think I am breaking new ground in saying that the word "sex" as a personal characteristic refers to the male and female of the species. Nor can there be doubt that, when Title VII was drafted in 1964, "sex" drew the distinction between men and women. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979).

In the opinion of the Court, the word "sex" undergoes modification and expansion. Thus the opinion reasons: "[l]ogically, because sexual orientation is a

function of sex and sex is a protected characteristic under Title VII, it follows that sexual orientation is also protected." Maj. Op. at 22. It is undeniable that sexual orientation is a "function of sex" in the (unhelpful) sense that it cannot be defined or understood without reference to sex. But surely that is because it has to do with sex--as so many things do. *Everything* that cannot be understood without reference to sex does not amount to sex itself as a term in Title VII. So it seems to me that all of these arguments are circular as well as unnecessary.

### III

The opinion of the Court relies in part on a comparator test, asking whether the employee would have been treated differently "but for" the employee's sex. But the comparator test is an evidentiary technique, not a tool for textual interpretation. "[T]he ultimate issue" for a court to decide in a Title VII case "is the reason for the individual plaintiff's treatment, not the relative treatment of different groups within the workplace." Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 121 (2d Cir. 2004). The opinion of the Court builds on the concept of homosexuality as a subset of sex, and this analysis thus merges in a fuzzy way with the definitional analysis. But when the comparator test is used for textual interpretation, it carries in train ramifications

that are sweeping and unpredictable: think fitness tests for different characteristics of men and women, not to mention restrooms.

**IV**

The opinion of the Court relies on the line of cases that bars discrimination based on sexual stereotype: the manifestation of it or the failure to conform to it. There are at least three reasons I am unpersuaded.

Anti-discrimination law should be explicable in terms of evident fairness and justice, whereas the analysis employed in the opinion of the Court is certain to be baffling to the populace.

The Opinion posits that heterosexuality is just another sexual convention, bias, or stereotype--like pants and skirts, or hairdos.  This is the most arresting notion in the opinion of the Court.  Stereotypes are generalizations that are usually unfair or defective.  Heterosexuality and homosexuality are both traits that are innate and true, not stereotypes of anything else.

If this case did involve discrimination on the basis of sexual stereotype, it would have been remanded to the District Court on that basis, as was done in Christiansen v. Omnicom Grp., Inc., 852 F.3d 195 (2d Cir. 2017) (per curiam).  The reason it could not be remanded on that basis is that the record does not

7

associate Mr. Zarda with any sexual stereotyping. The case arises from his verbal disclosure of his sexual orientation during his employment as a skydiving instructor, and that is virtually all we know about him. It should not be surprising that a person of any particular sexual orientation would earn a living jumping out of airplanes; but Mr. Zarda cannot fairly be described as evoking somebody's sexual stereotype of homosexual men. So this case does not present the (settled) issue of sexual stereotype, which I think is the very reason we had to go in banc in order to decide this case. As was made clear as recently as March 2017, "being gay, lesbian, or bisexual, standing alone, does not constitute nonconformity with a gender stereotype that can give rise to a cognizable gender stereotyping claim." Id. at 201.

JOSÉ A. CABRANES, *Circuit Judge, concurring in the judgment*:

I concur only in the judgment of the Court. It will take the courts years to sort out how each of the theories presented by the majority applies to other Title VII protected classes: "race, color, religion, . . . [and] national origin." 42 U.S.C. § 2000e-2(a)(1).

This is a straightforward case of statutory construction. Title VII of the Civil Rights Act of 1964 prohibits discrimination "because of . . . sex." *Id.* Zarda's sexual orientation is a function of his sex. Discrimination against Zarda because of his sexual orientation therefore *is* discrimination because of his sex, and is prohibited by Title VII.

That should be the end of the analysis.[1]

---

[1] *Cf.* 1 *Callimachus* fr. 465, at 353 (Rudolfus Pfeiffer ed., 1949) (3d century B.C.) (μέγα βιβλίον . . . μ[έ]γ[α] κακ[όν]).

SACK, *Circuit Judge*, concurring in the judgment, and in parts I (Jurisdiction), II.A (The Scope of Title VII), II:B.3 (Associational Discrimination), and II:C (Subsequent Legislative Developments) of the opinion for the Court.

We decide this appeal in the context of something of a revolution[1] in American law respecting gender and sex. It appears to reflect, *inter alia*, many Americans' evolving regard for and social acceptance of gay and lesbian persons. We are now called upon to address questions dealing directly with sex, sexual behavior, and sexual taboos, a discussion fraught with moral, religious, political, psychological, and other highly charged issues. For those reasons (among others), I think it is in the best interests of us all to tread carefully; to say no more than we must; to decide no more than is necessary to resolve this appeal. This is not for fear of offending, but for fear of the possible consequences of being mistaken in one unnecessary aspect or another of our decision.

In my view, the law of this Circuit governing what is referred to in the majority opinion as "associational discrimination" – discrimination against a person because of his or her association with another – is unsettled. What was

_____

[1] Welcomed by some, denounced by others, to be sure.

embraced by this Court in *Simonton v. Runyon*, 232 F.3d 33 (2d Cir. 2000) (holding, by implication, that associational discrimination on the basis of sex is not cognizable under Title VII), seems to have both been overtaken by, and to be inconsistent with, our later panel decision in *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008) (holding directly that associational discrimination on account of race is unlawful under Title VII).[2] Choosing between the two approaches, as I think we must, I agree with the majority that *Holcomb* is right and that *Simonton* is therefore wrong.[3] It is principally on that basis that I concur in the judgment of the Court.

My declination to join other parts of the majority opinion does not signal my disagreement with them. Rather, inasmuch as, in my view, this appeal can

---

[2] I find it hard to interpret the law to prohibit associational race discrimination but not associational sex discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 243 n.9 (1989) (plurality opinion) ("[T]he statute on its face treats each of the enumerated categories exactly the same."). If it weren't for *Simonton*, therefore, I would think *Holcomb* stands for the proposition that "where an employee is subjected to adverse action because an employer disapproves of [a same-sex] association, the employee suffers discrimination because of the employee's *own* [sex]." *Holcomb*, 521 F.3d at 139 (emphasis in original).

[3] *Holcomb* modified this Circuit's understanding of Title VII, and represents an "intervening development in the law" that justifies reconsideration of our prior precedent. *See Crown Coat Front Co. v. United States*, 363 F.2d 407, 414 (2d Cir. 1966) (Friendly, J., concurring) (quoting *Miss. River Fuel Corp. v. United States*, 314 F.2d 953, 958 (Ct. Cl. 1963) (Davis, J., concurring)), *rev'd*, 386 U.S. 503 (1967).

be decided on the simpler and less fraught theory of associational discrimination, I think it best to stop there without then considering other possible bases for our judgment.

RAYMOND J. LOHIER, JR., *Circuit Judge, concurring*:

I agree with the majority opinion that there is no reasonable way to disentangle sex from sexual orientation in interpreting the plain meaning of the words "because of . . . sex."  The first term clearly subsumes the second, just as race subsumes ethnicity.[1]  Oral Arg. Tr. at 53:5-6 (Government conceding that "ethnicity can be viewed as a subset of race").  From this central holding, the majority opinion explores the comparative approach, the stereotyping rationale, and the associational discrimination rationale to help determine "when a trait other than sex is . . . a proxy for (or function of) sex."  Maj. Op. at 31.  But in my view, these rationales merely reflect nonexclusive "evidentiary technique[s]," Jacobs, J., Concurring Op. at 6, frameworks, or ways to determine whether sex is a motivating factor in a given case, rather than interpretive tools that apply necessarily across all Title VII cases.  Zarda himself has described these three rationales as "evidentiary theories" or "routes."  Oral Arg. Tr. at 4:17-18.  On this understanding, I join the majority opinion as to Parts II.A and II.B.1.a, which reflect the textualist's approach, and join the remaining parts of the opinion only insofar as they can be said to apply to Zarda's particular case.

---

[1] In that sense, I agree with Judge Cabranes that the inquiry could end there.

A word about the dissents.  My dissenting colleagues focus on what they variously describe as the "ordinary, contemporary, common meaning" of the words "because of . . . sex," Lynch, L, Dissenting Op. at 19 n.8; Livingston, L, Dissenting Op. at 2, or the "public meaning of [those] words adopted by Congress in light of the social problem it was addressing when it chose those words," Lynch, L, Dissenting Op. at 61.  There are at least two problems with this position.  First, as the majority opinion points out, cabining the words in this way makes little or no sense of <u>Oncale</u> or, for that matter, <u>Price Waterhouse</u>.  <u>See</u> Maj. Op. at 24-25 .  Second, their hunt for the "contemporary" "public" meaning of the statute in this case seems to me little more than a roundabout search for legislative history.  Judge Lynch's laudable call (either as a way to divine congressional intent or as an interpretive check on the plain text approach) to consider what the legislature would have decided if the issue had occurred to the legislators at the time of enactment is, unfortunately, no longer an interpretive option of first resort.  Time and time again, the Supreme Court has told us that the cart of legislative history is pulled by the plain text, not the other way around.  The text here pulls in one direction, namely, that sex includes sexual orientation.

GERARD E. LYNCH, *Circuit Judge,* with whom Judge LIVINGSTON joins as to Parts I, II, and III, dissenting:

Speaking solely as a citizen, I would be delighted to awake one morning and learn that Congress had just passed legislation adding sexual orientation to the list of grounds of employment discrimination prohibited under Title VII of the Civil Rights Act of 1964. I am confident that one day — and I hope that day comes soon — I will have that pleasure.

I would be equally pleased to awake to learn that Congress had secretly passed such legislation more than a half century ago — until I actually woke up and realized that I must have been still asleep and dreaming. Because we all know that Congress did no such thing.

I

Of course, today's majority does not contend that Congress literally prohibited sexual orientation discrimination in 1964. It is worth remembering the historical context of that time to understand why any such contention would be indefensible.

The Civil Rights Act as a whole was primarily a product of the movement for equality for African-Americans. It grew out of the demands of that movement, and was opposed by segregationist white members of Congress who

opposed racial equality. Although the bill, even before it included a prohibition against sex discrimination, went beyond race to prohibit discrimination based on religion and national origin, there is no question that it would not have been under consideration at all but for the national effort to reckon to some degree with America's heritage of race-based slavery and government-enforced segregation.

It is perhaps difficult for people not then alive to understand that before the Civil Rights Act of 1964 became law, an employer could post a sign saying "Help Wanted; No Negroes Need Apply" without violating any federal law — and many employers did. Even the original House bill, introduced with the support of President Kennedy's Administration in 1963, did not prohibit racial discrimination by private employers.  Language prohibiting employment discrimination by private employers on the grounds of "race, color, religion or national origin" was added later by a House subcommittee. *See* Francis J. Vaas, *Title VII: Legislative History*, 7 B.C. Indus. & Comm. L. Rev. 431, 434–35 (1966); Chuck Henson, *Title VII Works–That's Why We Don't Like It*, 2 U. Miami Race & Soc. Just. L. Rev. 41, 62–63, 64 n.103 (2012).

Movement on the bill was slow. It was only after the March on Washington

in the summer of 1963, the assassination of President Kennedy in November of that year, and President Johnson's strong support for a civil rights bill that prohibited racial discrimination in employment, that the legislation made progress in Congress. Todd. S. Purdum, *An Idea Whose Time Has Come* 111–13, 151 (2014). But the private employment discrimination provision, like other sections of the bill prohibiting racial discrimination in public accommodations and federally funded programs, was openly and bitterly opposed by a large contingent of southern members of Congress. *See* Louis Menand, *The Sex Amendment*, The New Yorker (July 21, 2014), http://www.newyorker .com/magazine/2014/07/21/sex-amendment. Its passage was by no means assured when the floor debates in the House began.

From the moment President Kennedy proposed the Civil Rights Act in 1963, women's rights groups, with the support of some members of Congress, had urged that sex discrimination be included as a target of the legislation. Purdum, *supra*, at 196. The movements in the United States for gender and racial equality have not always marched in tandem — although there was some overlap between abolitionists and supporters of women's suffrage, suffragists often relied on the racially offensive argument that it was outrageous that white

women could not vote when black men could.[1] But by the 1960s, many feminist

advocates consciously adopted arguments parallel to those of the civil rights

movement, and there was growing recognition that the two causes were linked in

fundamental ways.[2]

---

[1] For example, Susan B. Anthony herself stated, in a dialogue with Frederick Douglass:

> The old anti-slavery school say [*sic*] women must stand back and
> wait until the negroes shall be recognized. But we say, if you will
> not give the whole loaf of suffrage to the entire people, give it to
> the most intelligent first. If intelligence, justice, and morality are
> to have precedence in the Government, let the question of woman
> be brought up first and that of the negro last.

Transcript of Annual Meeting of American Equal Rights Association (1869), reprinted in *History of Woman Suffrage: 1861–1876*, 383 (Elizabeth Cady Stanton et al. eds.) (1882). During the debate over the addition of "sex" to Title VII, it was similarly argued that if sex was not added to the prohibited categories of discrimination, white women would have fewer protections than black men. As Representative Martha Griffiths, an early supporter of the amendment, warned during congressional hearings, "A vote against this amendment today by a white man is a vote against his wife, or his widow, or his daughter, or his sister." Gillian Thomas, *Because of Sex* 2 (2016). And both the civil rights and the women's movements have persistently overlooked the intersectional existence of black women and other women of color. *See* Kimberlé Crenshaw, *Mapping the Margins*: *Intersectionality, Identity Politics, and Violence Against Women of Color*, 43 Stanford L. Rev. 1241, 1242–43 & n.3 (1991).

[2] Pauli Murray and Mary O. Eastwood, lawyers and women's rights activists, exemplified that recognition, writing:

> [I]n matters of discrimination, the problems of women are not as
> unique as has been generally assumed. That manifestations of
> racial prejudice have been more brutal than the more subtle
> manifestations of prejudice by reason of sex in no way diminishes
> the force of the equally obvious fact that the rights of women and
> the rights of Negroes are only different phases of the fundamental
> and indivisible issue of human rights.

Women's rights groups had been arguing for laws prohibiting sex discrimination since at least World War II, and had been gaining recognition for the agenda of the women's rights movement in other arenas. In addition to supporting (at least rhetorically) civil rights for African-Americans, President Kennedy had taken tentative steps towards support of women's rights as well. In December 1961, he created the President's Commission on the Status of Women, chaired until her death by Eleanor Roosevelt. Exec. Order No. 10980, 26 Fed. Reg. 12,059 (Dec. 14, 1961). Among other goals, the Commission was charged with developing recommendations for "overcoming discriminations in . . . employment on the basis of sex," and suggesting "services which will enable women to continue their role []as wives and mothers while making a maximum contribution to the world around them." *Id.*

The Commission's report highlighted the increasing role of women in the workplace, noting (in an era when the primacy of women's role in child-rearing and home-making was taken for granted) that even women with children generally spent no more than a decade or so of their lives engaged in full-time

---

Pauli Murray & Mary O. Eastwood, *Jane Crow and the Law: Sex Discrimination and Title VII*, 34 Geo. Wash. L. Rev. 232, 235 (1965) (footnote omitted).

child care, allowing a significant portion of women's lives to be dedicated to education and employment. *American Women*: *Report of The President's Commission on the Status of Women* 6–7 (1963). Accordingly, the Commission advocated a variety of steps to improve women's economic position.  *Id.* at 6–7, 10. While those recommendations did not include federal legislation prohibiting employment discrimination on the basis of sex, they did include a commitment to equal opportunity in employment by federal contractors and proposed such equality as a goal for private employers — as well as proposing other innovations, such as paid maternity leave and universal high-quality public child care, that have yet to become the law of the land. *Id.* at 20, 30, 43.

Nevertheless, the notion that women should be treated equally at work remained controversial. By 1964, only two states, Hawaii and Wisconsin, prohibited sex discrimination in employment. Purdum, *supra*, at 196. Although decades had passed since the Supreme Court announced in *Muller v. Oregon*, 208 U.S. 412 (1908), that laws limiting the hours that women could work did not violate the Fourteenth Amendment, but rather were an appropriate accommodation for women's fragile constitutions and more pressing maternal obligations, *id.* at 420–21, state laws "protecting" women from the rigors of the

workplace remained commonplace. Purdum, *supra*, at 196; *see also Hoyt v. Florida*, 368 U.S. 57, 62 (1961) (upholding a law requiring women, specifically, to opt in to jury service, in part because "woman is still regarded as the center of home and family life").

Accordingly, when Representative Howard W. Smith of Virginia, a die-hard opponent of integration and federal legislation to enforce civil rights for African-Americans, proposed that "sex" be added to the prohibited grounds of discrimination in the Civil Rights Act, there was reason to suspect that his amendment was an intentional effort to render the Act so divisive and controversial that it would be impossible to pass. *See*, *e.g.*, *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) (suggesting that the "sex amendment was the gambit of a congressman seeking to scuttle adoption of the Civil Rights Act"); Comment, *Sex Discrimination in Employment*, 35 Fordham L. Rev. 503, 504 n.16 (1967). That might not have been the case, however. Like those early suffragettes who were ambivalent about, or hostile to, racial equality, Smith also had a prior history of support for (presumably white) women's equality. For example, he had been a longstanding supporter of a constitutional amendment guaranteeing equal rights to women. Purdum, *supra*, at 196; *see also* Gillian Thomas, *Because of*

7

*Sex* 2 (2016).

Whatever Smith's subjective motivations for proposing it, the amendment was adamantly opposed by many northern liberals on the ground that it would undermine support for the Act as a whole. Purdum, *supra*, at 197; Menand, *supra*. Indeed, the *New York Times* ridiculed the amendment, suggesting that, among other alleged absurdities, it would require Radio City Music Hall to hire male Rockettes, and concluding that "it would have been better if Congress had just abolished sex itself." Editorial, *De-Sexing the Job Market*, N.Y. Times, August 21, 1965.

But despite its contested origins, the adoption of the amendment prohibiting sex discrimination was not an accident or a stunt. Once the amendment was on the floor, it was aggressively championed by a coalition comprising most of the (few) women members of the House. Purdum, *supra*, at 197. Its subsequent adoption was consistent with a long history of women's rights advocacy that had increasingly been gaining mainstream recognition and acceptance.

Discrimination against gay women and men, by contrast, was not on the table for public debate. In those dark, pre-Stonewall days, same-sex sexual

relations were criminalized in nearly all states. Only three years before the passage of Title VII, Illinois, under the influence of the American Law Institute's proposed Model Penal Code, had become the first state to repeal laws prohibiting private consensual adult relations between members of the same sex. Salvatore J. Licata, *The Homosexual Rights Movement in the United States: A Traditionally Overlooked Area of American History*, 6 J. Homosexuality 161, 171 (1981).

In addition to criminalization, gay men and women were stigmatized as suffering from mental illness. In 1964, both the American Psychiatric Association and the American Psychological Association regrettably classified homosexuality as a mental illness or disorder. As the Supreme Court recently explained, "[f]or much of the 20th century . . . homosexuality was treated as an illness. When the American Psychiatric Association published the first Diagnostic and Statistical Manual of Mental Disorders in 1952, homosexuality was classified as a mental disorder, a position adhered to until 1973." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2596 (2015), citing Position Statement on Homosexuality and Civil Rights, 1973, in 131 Am. J. Psychiatry 497 (1974). It was not until two years later, in 1975, that the American Psychological Association followed suit and "adopted the same position [as the American Psychiatric Association], urging all mental health

professionals to work to dispel the stigma of mental illness long associated with homosexual orientation." Brief of Am. Psychological Ass'n as *Amicus Curiae*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 2000 WL 339884, at *8 (2000), citing Am. Psychological Ass'n, *Minutes of the Annual Meeting of the Council of Representatives*, in 30 Am. Psychologist 620, 633 (1975). Because gay identity was viewed as a mental illness and was, in effect, defined by participation in a criminal act, the employment situation for openly gay Americans was bleak.

Consider the rules regarding employment by the federal government. Starting in the 1940s and continuing through the 1960s, thanks to a series of executive orders repealing long-standing discriminatory policies, federal employment opportunities for African-Americans began to open up significantly. *See, e.g.*, Exec. Order No. 9980, 13 Fed. Reg. 4,311 (July 26, 1948) (prohibiting racial discrimination in civilian agencies); Exec. Order No. 10308, 16 Fed. Reg. 12,303 (December 3, 1951) (creating the Committee on Government Compliance to enforce the prohibition against racial discrimination by firms contracting with the government); Exec. Order No. 11114, 28 Fed. Reg. 6,485 (June 22, 1963) (extending prohibition against discrimination to all federally-funded construction projects). In sharp contrast, in 1953 President Eisenhower signed an executive

order *excluding* persons guilty of "sexual perversion" from government employment. Exec. Order No. 10450, 18 Fed. Reg. 2,489 (April 27, 1953); *see also* Licata, *supra*, at 167–68. During the same period, gay federal employees, or employees even suspected of being gay, were systematically hounded out of the service as "security risks" during Cold-War witchhunts. Licata, *supra*, at 167–68.

Civil rights and civil liberties organizations were largely silent.[3] Licata, *supra*, at 168. In an influential book about the political plight of gay people, Edward Sagarin, writing under the pseudonym Donald Webster Cory, sharply criticized the silence of the bar. Donald Webster Cory, *The Homosexual in America: A Subjective Approach* (1951). For instance, he described the response to the abusive tactics used against members of the military discharged for homosexual conduct as follows: "And who raises a voice in protest against such

---

[3] In fact, many civil rights and women's rights organizations were reluctant to support gay rights. *See, e.g.*, Bhaskar A. Shukla, *Feminism: From Mary Wollstonecraft to Betty Friedan* 111 (2007) (describing how Betty Friedan had opposed "equating feminism with lesbianism," and is said to have coined the anti-lesbian phrase "Lavender Menace" during a 1969 National Organization for Women meeting). Similarly, some civil rights leaders were uncomfortable with according public prominence to Bayard Rustin, a gay black man, despite his formidable organizing skills. Rustin was a leading strategist of the civil rights movement, and was the chief organizer of the 1963 March on Washington. John D'Emilio, *Lost Prophet: The Life and Times of Bayard Rustin* 2–3 (2003). Although Rustin spent most of his life fighting for civil rights for African-Americans, "[p]rejudice of another sort, still not named as such in mid century America, had curtailed his opportunities and limited his effectiveness." *Id.* at 326–27 (2003).

11

discrimination? No one. Where was the American Civil Liberties Union?

Nowhere." *Id.* at 45. To the extent that civil rights organizations did begin to

engage with gay rights during the early 1960s, they did so through the lens of

sexual liberty, rather than equality, grouping the prohibition of laws against

same-sex relations with prohibitions of birth control, abortion, and adultery.[4]

Even by the mid-1960s, the ACLU was identified by *Newsweek* as the only group

"apart from the homophile organizations" that opposed laws criminalizing

homosexual acts. Leigh Ann Wheeler, *How Sex Became a Civil Liberty* 155 (2013).

Given the criminalization of same-sex relationships and arbitrary and

abusive police harassment of gay and lesbian citizens, nascent gay rights

organizations had more urgent concerns than private employment

discrimination. As late as 1968, four years *after* the passage of Title VII, the North

---

[4] For example, at the ACLU's Biennial Conference in 1964, in a speech tellingly titled "Civil Liberties and the War on Crime," activist lawyer Harriet Pilpel advocated a constitutionally protected right to privacy as a necessary corrective to the civil liberties abuses perpetuated by laws "relating to birth control, abortion, compulsory sterilization, prostitution, miscegenation, homosexuality, fornication and adultery." Allison Day, *Guiding* Griswold*: Reevaluating National Organizations' Role in the Connecticut Birth Control Cases*, 22 Cardozo J. L. & Gender 191, 216–18 & n.204 (2016); *see also* Samuel Walker, *In Defense of American Liberties: A History of the ACLU* 312 (1990) (crediting Pilpel's speech as the first substantive introduction of gay rights to the ACLU's agenda). Pilpel's argument was not based on equal protection, and made no claim that the criminalization of same-sex relations constituted a form of sex discrimination or gender bias.

American Conference of Homophile Organizations proposed a "Homosexual Bill of Rights" that demanded five fundamental rights: that private consensual sex between adults not be a crime; that solicitation of sex acts not be prosecuted except on a complaint by someone other than an undercover officer; that sexual orientation not be a factor in granting security clearances, visas, or citizenship; that homosexuality not be a barrier to service in the military; and that sexual orientation not affect eligibility for employment *with federal, state, or local governments*. Licata, *supra*, at 177 (emphasis added). Those proposals, which pointedly did not include a ban on private sector employment discrimination against gays, evidently had little traction with many Americans at the time. The first state to prohibit employment discrimination on the basis of sexual orientation even in the public sector was Pennsylvania, by executive order of the governor, in 1975 — more than a decade after the Civil Rights Act had become law. James W. Button et al., *The Politics of Gay Rights at the Local and State Level*, in *The Politics of Gay Rights* 269, 272 (Craig A. Rimmerman et al. eds., 2000). It was not until 1982 that Wisconsin became the first state to ban both public and private sector discrimination based on sexual orientation. *Id.* at 273; *see also* Linda A. Mooney et al., *Understanding Social Problems* 467 (6th ed. 2009). Massachusetts

13

followed in 1989. Button et al., *supra*, at 273. Notably, as discussed more fully below, these states did so by explicit legislative action adding "sexual orientation" to pre-existing anti-discrimination laws that already prohibited discrimination based on sex; they did not purport to "recognize" that sexual orientation discrimination was merely an aspect of already-prohibited discrimination based on sex.

In light of that history, it is perhaps needless to say that there was no discussion of sexual orientation discrimination in the debates on Title VII of the Civil Rights Act. If some sexist legislators considered the inclusion of sex discrimination in the bill something of a joke, or perhaps a poison pill to make civil rights legislation even more controversial, evidently no one thought that adding sexual orientation to the list of forbidden categories was worth using even in that way. Nor did those who opposed the sex provision in Title VII include the possibility that prohibiting sex discrimination would also prevent sexual orientation discrimination in their parade of supposed horribles. When Representative Emanuel Celler of New York, floor manager for the Civil Rights Bill in the House, rose to oppose Representative Smith's proposed amendment, he expressed concern that it would lead to such supposed travesties as the

14

elimination of "protective" employment laws regulating working conditions for women, drafting women for military service, and revisions of rape and alimony laws. *See* 110 Cong. Rec. 2,577 (1964). He did not reference the prohibition of sexual orientation discrimination.[5] The idea was nowhere on the horizon.

## II

I do not cite this sorry history of opposition to equality for African-Americans, women, and gay women and men, and of the biases prevailing a half-century ago, to argue that the private intentions and motivations of the members of Congress can trump the plain language or clear implications of a legislative enactment. (Still less, of course, do I endorse the views of those who opposed racial equality, ridiculed women's rights, and persecuted people for their sexual orientation.) Although Chief Judge Katzmann has observed elsewhere that judicial warnings about relying on legislative history as an interpretive aid have

---

[5] By contrast, by the early 1970s, when Congress finally got around to proposing the Equal Rights Amendment ("ERA") for ratification, gay issues were at least on the radar screen, albeit only as a talking point of opponents that was quickly disavowed by the ERA's supporters. Senator Sam Ervin, who opposed the ERA, purported to be concerned that its broad language might invalidate laws that "make homosexuality a crime or . . . [require states to recognize] the right of a man to marry another man or the right of a woman to marry a woman." 118 Cong. Rec. 9,315 (1972). Senator Birch Bayh, the chief sponsor of the ERA, hastened to deny that the Amendment would have any such effect, reassuring the Senate that the ERA would require only that "if a State legislature makes a judgment that it is wrong for a man to marry a man, then it must say it is wrong for a woman to marry a woman." *Id*. at 9,331.

15

been overstated, *see* Robert A. Katzmann, *Judging Statutes* 35–39 (2014), I agree with him, and with my other colleagues in the majority, that the implications of legislation flatly prohibiting sex discrimination in employment, duly enacted by Congress and signed by the President, cannot be cabined by citing the private prejudices or blind spots of those members of Congress who voted for it.[6] The above history makes it obvious to me, however, that the majority misconceives the fundamental *public* meaning of the language of the Civil Rights Act. The problem sought to be remedied by adding "sex" to the prohibited bases of employment discrimination was the pervasive discrimination against women in the employment market, and the chosen remedy was to prohibit discrimination that adversely affected members of one sex or the other. By prohibiting discrimination against people based on their sex, it did not, and does not, prohibit discrimination against people because of their sexual orientation.

---

[6] In the years immediately following the enactment of Title VII, however, even certain prominent officials charged with enforcing it seemed to take the opposite approach, interpreting the statute, insofar as it prohibited sex discrimination, in the light of the presumed prejudices of those who adopted it. Franklin Roosevelt, Jr., the first chair of the Equal Employment Opportunity Commission, believed that the ban on sex discrimination was an inadvertent add-on, and as a result need not be enforced as strictly as the prohibition on racial discrimination. When asked, at his first press conference as head of the EEOC, "What about sex?" Roosevelt responded, "Don't get me started. I'm all for it." Thomas, *supra*, at 4. One of the agency's first executive directors, Herman Edelsberg, was no better, dismissing the provision as a "fluke" that was "conceived out of wedlock." *Id.*

A

To start, the history of the overlapping movements for equality for blacks, women, and gays, and the differing pace of their progress, as outlined in the previous section, tells us something important about what the language of Title VII must have meant to any reasonable member of Congress, and indeed to any literate American, when it was passed — what Judge Sykes has called the "original *public* meaning" of the statute. *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 362 (7th Cir. 2017) (*en banc*) (Sykes, *J.*, dissenting) (emphasis added). That history tells us a great deal about why the legislators who constructed and voted for the Act used the specific language that they did.

The words used in legislation are used for a reason. Legislation is adopted in response to perceived social problems, and legislators adopt the language that they do to address a social evil or accomplish a desirable goal. The words of the statute take meaning from that purpose, and the principles it adopts must be read in light of the problem it was enacted to address. The words may indeed cut deeper than the legislators who voted for the statute fully understood or intended: as relevant here, a law aimed at producing gender equality in the workplace may require or prohibit employment practices that the legislators who

17

voted for it did not yet understand as obstacles to gender equality. Nevertheless, it remains a law aimed at *gender* inequality, and not at other forms of discrimination that were understood at the time, and continue to be understood, as a different kind of prejudice, shared not only by some of those who opposed the rights of women and African-Americans, but also by some who believed in equal rights for women and people of color.

The history I have cited is not "legislative history" narrowly conceived. It cannot be disparaged as a matter of attempts by legislators or their aides to influence future judicial interpretation — in the direction of results they could not convince a majority to support in the overt language of a statute — by announcing to largely empty chambers, or inserting into obscure corners of committee reports, explanations of the intended or unintended legal implications of a bill. Nor am I seeking to infer the unexpressed wishes of all or a majority of the hundreds of legislators who voted for a bill without addressing a particular question of interpretation. Rather, I am concerned with what principles Congress committed the country to by enacting the words it chose.[7] I contend that these

---

[7] Despite my explicit clarity about this point, both the majority, *see* Maj. Op. at 28 (characterizing "reliance on the principal concern of our legislators" as "the centerpiece of the dissent's statutory analysis") (internal quotation marks omitted), and Judge Lohier's concurrence, *see* Lohier, *J.* Concurring Op. at 2 (characterizing this opinion as a "call . . . to

principles can be illuminated by an understanding of the central public meaning

of the language used in the statute at the time of its enactment.[8]

If the specifically *legislative* history of the "sex amendment" is relatively

sparse in light of its adoption as a floor amendment, *see* Maj. Op. at 59 n.31, the

broader *political and social* history of the prohibition of sex discrimination in

employment is plain for all to read. The history of the 20th century is, among

---

consider what the legislature would have decided if the issue had occurred to the legislators at the time of enactment"), fail to grasp it. As the text above makes plain, I do not contend that Title VII is limited by what members of Congress who voted for it privately believed or intended to prohibit, or might have hoped it would or would not do. The question here is what "discriminate against any individual . . . because of such individual's . . . sex," 42 U.S.C. § 2000e-2(a)(1), as contrasted to "discriminate against any individual . . . because of such individual's . . . sexual orientation," meant (and continues to mean) to ordinary speakers of English. Legislation cannot sensibly be interpreted by stringing together dictionary synonyms of each word and proclaiming that, if the right example of the meaning of each is selected, the "plain meaning" of the statute leads to a particular result. No theory of interpretation, including textualism itself, is premised on such an approach. (No less a textualist than Justice Scalia recognized the point: "Adhering to the *fair meaning* of the text . . . does not limit one to the hyperliteral meaning of each word in the text." Antonin Scalia and Bryan A. Garner, *Reading Law* 356 (2012) (emphasis in original).) That is because the political and social context of the words is critical to understanding what it is that the political branches of our government wrote into law. (Justice Scalia again: Because most common English words "have a number of dictionary definitions," a court should ordinarily "assume the *contextually appropriate* ordinary meaning." *Id*. at 70 (emphasis added).)

[8] As the Supreme Court has repeatedly instructed, "[i]t is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" *Sandifer v. U.S. Steel Corp*., 134 S. Ct. 870, 876 (2014), quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979). It is worth noting, moreover, that, because legislation is a fundamentally *political* process, the *political* context of legislation, and the way in which language is (or is *not*) used in the public debate over proposed legislation, can be useful in understanding that meaning.

other things, a history of increasing equality of men and women. Recent events remind us of how spotty that equality remains, and how inequality persists even with respect to the basic right of women to physical security and control of their own bodies. But the trend is clear, and it is particularly emphatic in the workplace.

That history makes it equally clear that the prohibition of discrimination "based on sex" was intended to secure the rights of women to equal protection in employment. Put simply, the addition of "sex" to a bill to prohibit employers from "discriminat[ing] against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, . . . or national origin," 42 U.S.C. § 2000e-2(a)(1), was intended to eliminate workplace inequalities that held women back from advancing in the economy, just as the original bill aimed to protect African-Americans and other racial, national, and religious minorities from similar discrimination. The language of the Act itself would have been so understood not only by members of Congress, but by any politically engaged citizen deciding whether to urge his or her representatives to vote for it. As Judge Sykes noted in her dissent in the Seventh Circuit's encounter with the same issue we face today,

citing a 1960s dictionary, "In common, ordinary usage in 1964 — and now, for that matter — the word 'sex' means biologically *male* or *female*; it does not also refer to sexual orientation." *Hively*, 853 F.3d at 362–63 (Sykes, *J.*, dissenting) (emphasis in original).[9] On the verge of the adoption of historic legislation to address bigotry against African-Americans on the basis of race, women in effect stood up and said "us, too," and Congress agreed.

The majority cites judicial interpretations of Title VII as prohibiting sexual harassment, and allowing hostile work environment claims, in an effort to argue that the expansion they are making simply follows in this line. Maj. Op. at 25, 27–28. But the fact that a prohibition on discrimination against members of one sex may have unanticipated consequences when courts are asked to consider carefully whether a given practice does, in fact, discriminate against members of one sex in the workplace does not support extending Title VII by judicial

---

[9] The majority agrees, at least "*arguendo*." Maj. Op. at 7 n.2. Issues about how to define who falls into which gender, or whether the division of humanity into two sexes or genders is oversimplified as applied to persons who identify as transgender or gender fluid or bigendered are not before us today, and neither the majority nor the plaintiffs nor their *amici* contend that gay and lesbian individuals constitute a third or fourth sex. *Cf. Hively*, 853 F.3d at 355 (Posner, *J.*, concurring) ("It's true that even today if asked what is the sex of plaintiff Hively one would answer that she is female or that she is a woman, not that she is a lesbian. Lesbianism denotes a form of sexual or romantic attraction; it is not a physical sex identifier like masculinity or femininity.").

construction to protect an entirely different category of people. It is true that what *counts* as discrimination against members of one sex may not have been fully fleshed out in the minds of supporters of the legislation, but it is easy enough to illustrate how the language of a provision enacted to accomplish the goal of equal treatment of the sexes compels results that may not have been specifically intended by its enacters.

To begin with, just as laws prohibiting racial discrimination, adopted principally to address some of the festering national wrongs done to African-Americans, protect members of *all* races, including then-majority white European-Americans, the prohibition of sex discrimination by its plain language protects men as well as women, whether or not anyone who voted on the bill specifically considered whether and under what circumstances men could be victims of gender-based discrimination. That is not an expansion of Title VII, but is a conclusion mandated by its text: Congress deliberately chose to protect women and minorities not by prohibiting discrimination against "African-Americans" or "Jews" or "women," but by neutrally prohibiting discrimination against any individual "based on race, . . . religion, [or] sex." 42 U.S.C. § 2000e-2(a)(1). That choice of words is clearly intentional, and represents a commitment

22

to a principle of equal treatment of races, religions, and sexes that is important, even if the primary intended beneficiaries of the legislation — those most in need of its protection — are members of the races, religions, and gender that have suffered the most from *in*equality in the past.

Other interpretations of the statute that may not have occurred to members of the overwhelmingly male Congress that adopted it seem equally straightforward. Perhaps it did not occur to some of those male members of Congress that sexual harassment of women in the workplace was a form of employment discrimination, or that Title VII was inconsistent with a "Mad Men" culture in the office.[10] But although a few judges were slow to recognize this point, *see, e.g., Barnes v. Train*, No. 1828-73, 1974 WL 10628, at *1 (D.D.C. Aug. 9, 1974), *rev'd sub nom. Barnes v. Costle*, 561 F.2d 983 (D.C. Cir. 1977), as soon as the issue began to arise in litigation, courts quickly recognized that for an employer to expect members of one sex to provide sexual favors as a condition of employment from which members of the other sex are exempt, or to view the

---

[10] As we have recently been reminded, too many powerful men continue to engage in such practices. *See, e.g.,* J.M.F., *What is Sexual Harassment and How Prevalent Is It?*, The Economist (Nov. 24, 2017), https://www.economist.com/blogs/economist -explains/2017/11/economist-explains-17 (writing that "[i]n recent months myriad women have detailed the sexual harassment and assault they have experienced in . . . Hollywood, Silicon Valley, politics, the media, the armed forces, [and] academia").

only value of female employees as stemming from their sexualization, constitutes

a fundamental type of discrimination in conditions of employment based on sex.

*See, e.g., Barnes v. Costle*, 561 F.2d at 989 (finding that retaliation by plaintiff's

supervisor when she resisted his sexual advances "was plainly based on

[plaintiff's] gender").[11]

The reason why any argument to the contrary would fail is not a matter of

simplistic application of a formal standard, along the lines of "well, the employer

wouldn't have asked the same of a man, so it's sex discrimination." Sexual

exploitation has been a principal obstacle to the equal participation of women in

the workplace, and whether or not individual legislators intended to prohibit it

when they cast their votes for Representative Smith's amendment, both the literal

language of that amendment *and* the elimination of the social evil at which it was

---

[11] Indeed, the overt objectification of female employees was highlighted in debates immediately following the enactment of Title VII. One industry notorious for sexualizing women was the airline industry, which hired only young, attractive women to serve as flight attendants. Stephanie Coontz, *A Strange Stirring: The Feminine Mystique and American Women at the Dawn of the 1960s* 9–10 (2011). Flight attendants were forced to retire upon marriage, or, if they did not marry, once they reached their early thirties because, as one airline official commented, "the average woman's appearance has markedly deteriorated at this age." *Id.* at 10. In 1965, responding to public (male) commentary lamenting the idea that Title VII might mean an end to the practice of hiring only female flight attendants, Representative Martha Griffiths remarked, "If you are trying to run a whorehouse in the sky, get a license." Menand, *supra*.

aimed make clear that the statute must be read to prohibit it.[12]

The same goes for other forms of "hostile environment" discrimination. The history of resistance to racial integration illustrates why. Employers forced to take down their "whites only" signs could not be permitted to retreat to the position that "you can make me hire black workers, but you can't make me welcome them." Making black employees so *un*welcome that they would be deterred from seeking or retaining jobs previously reserved for whites *must be* treated as an instance of prohibited racial discrimination — and the same clearly goes for sex discrimination. The Supreme Court recognized that point, in exactly those terms:

> The phrase "terms, conditions or privileges of employment" in Title VII is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination. . . . Nothing in Title VII suggests that a hostile environment based on discriminatory sexual harassment should not be

---

[12] The text of the sex provision, as well as the principle of equal treatment of both sexes makes it as obvious that the less-frequently encountered situation of sexual harassment of male employees, whether by men or by women, must also be included in Title VII's prohibitions. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) (noting that under Title VII, "[m]ale as well as female employees are protected against discrimination"); *see also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998) (holding that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant . . . are of the same sex").

likewise prohibited.

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) (internal quotation marks, brackets and emphasis omitted).

But such interpretations of employment "discrimination against any individual . . . based on sex" do not say anything about whether discrimination based on *other* social categories is covered by the statute. Just as Congress adopted broader language than discrimination "against women," it adopted narrower language than "discrimination based on personal characteristics or classifications unrelated to job performance." Title VII does not adopt a broad principle of equal protection in the workplace; rather, its language singles out for prohibition discrimination based on particular categories and classifications that have been used to perpetuate injustice — but not all such categories and classifications. That is not a matter of abstract justice, but of political reality. Those groups that had succeeded by 1964 in persuading a majority of the members of Congress that unfair treatment of them ought to be prohibited were included; those who had not yet achieved that political objective were not.

Thus, if Representative Smith's amendment had been defeated, Title VII would still be a landmark prohibition of the kinds of race-, religion-, and national

26

origin-based employment discrimination that had historically disadvantaged

blacks, Jews, Catholics, or Mexican-Americans. But it would not have protected

women, and a subsequent shift in popular support for such protection would not

have changed that fact, without legislative action. Similarly, the statute did not

protect those discriminated against, similarly unfairly, on the basis of age or

disability; that required later legislation. *See, e.g.*, Americans with Disabilities Act

of 1990, 42 U.S.C. § 12101 *et seq.*; Age Discrimination in Employment Act of 1967,

29 U.S.C. § 621 *et seq.*

None of this, of course, is remotely to suggest that employment

discrimination on the basis of sexual orientation is somehow not invidious and

wrong. But not everything that is offensive or immoral or economically

inefficient is illegal, and if the view that a practice is offensive or immoral or

economically inefficient does not command sufficiently broad and deep political

support to produce legislation prohibiting it, that practice will remain legal. In

the context of private-sector employment, racial discrimination was just as

indefensible before 1964 as it is today, but it was not illegal. Discrimination

against women, as President Kennedy's commission understood, was just as

unfair, and just as harmful to our economy, before Title VII prohibited it as it is

now, but if Congress had not adopted Representative Smith's amendment, it would have remained legal. Employment discrimination against older workers, and against qualified individuals with disabilities, imposed unfair burdens on those categories of individuals in 1964, yet it remained legal after the Civil Rights Act of 1964 became law, because Congress did not at that time choose to prohibit such discrimination. Congress is permitted to choose what types of social problems to attack and by which means. The majority says that "we have stated that 'Title VII should be interpreted broadly to achieve equal employment opportunity,'" Maj. Op. at 18, quoting *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988), but of course that dictum[13] appeared in the context of a discussion of racial discrimination. Congress, in fact, did not legislate in 1964 "broadly to achieve equal employment opportunity" for *all* Americans, but instead opted to prohibit only certain categories of unfair discrimination. It did not then prohibit, and alas has not since prohibited, discrimination based on sexual orientation.

---

[13] The quoted statement from *Huntington* is actually a parenthetical squib glossing a citation to *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–36 (1971), and summarizing the import of a lengthy discussion in that seminal Supreme Court decision; *Huntington* itself concerned the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, codified at 42 U.S.C. §§ 3601–3631. *Huntington*, 844 F.2d at 928.

B

The majority's linguistic argument does not change the fact that the

prohibition of employment discrimination "because of . . . sex" does not protect

gays and lesbians. Simply put, discrimination based on sexual orientation is not

the same thing as discrimination based on sex. As Judge Sykes explained,

> [t]o a fluent speaker of the English language — then and
> now — the ordinary meaning of the word "sex" does
> not fairly include the concept of "sexual orientation."
> The two terms are never used interchangeably, and the
> latter is not subsumed within the former; there is no
> overlap in meaning. . . . The words plainly describe
> different traits, and the separate and distinct meaning of
> each term is easily grasped. More specifically to the
> point here, discrimination "because of sex" is not
> reasonably understood to include discrimination based
> on sexual orientation, a different immutable
> characteristic. Classifying people by sexual orientation
> is different than classifying them by sex.

*Hively*, 853 F.3d at 363 (Sykes, *J.*, dissenting) (footnote omitted).

Of course, the majority does not really dispute this common-sense

proposition. It does not say that "sex discrimination" in the ordinary meaning of

the term is literally the same thing as "sexual orientation discrimination." Rather,

the majority argues that discrimination based on sex encompasses discrimination

against gay people because discrimination based on sex encompasses any

29

distinction between the sexes that an employer might make for any reason.[14] The argument essentially reads "discriminate" to mean pretty much the same thing as "distinguish." And indeed, there are recognized English uses of "discriminate," particularly when followed with "between" or "from," that imply nothing invidious, but merely mean "to perceive, observe or note [a] difference," or "[t]o make or recognize a distinction." The Oxford English Dictionary Online, http://www.oed.com (search for "Discriminate," verb, definitions 2a and 2b). For example, a person with perfect pitch is capable of discriminating a C from a C-sharp. But in the language of civil rights, a different and stronger meaning applies, that references *invidious* distinctions: "To treat a person or group in an unjust or prejudicial manner, esp[ecially] on the grounds of race, gender, sexual orientation, etc.; frequently with *against*." *Id*. (definition 4).

And that is indeed the sense in which Title VII uses the word: the statute prohibits such practices as "fail[ing] or refus[ing] to hire or to discharge" persons on account of their race or sex or other protected characteristic, or "otherwise to

---

[14] Indeed, Judge Cabranes's concurring opinion suggests that that interpretation is so obvious and straightforward that nothing more need be said on the subject, and that we can dispense with the various arguments from precedent and principle that the majority opinion makes in support of its holding. Cabranes, *J.*, Concurring Op. at 1. But that interpretation, in fact, is anything but obvious.

discriminate *against* any individual" with respect to employment terms. 42 U.S.C.

§ 2000e-2(a)(1) (emphasis added). In other words, it is an oversimplification to

treat the statute as prohibiting any distinction *between* men and women in the

workplace, still less any distinction that so much as requires the employer to

*know* an employee's sex in order to be applied, *cf.* Maj. Op. at 21–22; the law

prohibits discriminating *against* members of one sex or the other in the

workplace.

That point may have little bite in the context of racial discrimination. The

different "races" are defined legally and socially, and not by actual biological or

genetic differences — both Hitler's Nuremberg laws and American laws

imposing slavery and segregation had to define, arbitrarily, how much ancestry

of a particular type consigned persons to a disfavored category, since there is no

scientific or genetic basis for distinguishing a "Jew" or a "member of the colored

race" from anyone else. And since no biological factor can support any job

qualification based on race, courts have taken the view that to distinguish *is*, for

the most part, to discriminate against. But in the area of sex discrimination,

where the groups to be treated equally do have potentially relevant biological

differences, not every distinction between men and women in the workplace

31

constitutes discrimination against one gender or the other.[15] The distinctions that were prohibited, however, in either case, are those that operate to the disadvantage of (principally) the disfavored race or sex. That is the social problem that the statute aimed to correct.

Opponents of Title VII, and later of the Equal Rights Amendment ("ERA"), were fond of conjuring what they thought of as unthinkable or absurd consequences of gender equality. Some of those proved not so unthinkable or absurd at all. Workplace "protective" legislation that applied only to women soon fell by the wayside, *see* 29 C.F.R. § 1604.2(b)(1) (stating that protective laws for women "conflict with and are superseded by [T]itle VII"), despite

---

[15] The majority's reliance on a footnote in *Price Waterhouse* does nothing to change this fact. Maj. Op. at 47–48. The majority quotes the portion of the footnote stating that Title VII "on its face treats each of the enumerated categories exactly the same," and that the "principles . . . announce[d]" by the *Price Waterhouse* Court with regard to gender "apply with equal force to discrimination based on race, religion, or national origin," to support its conclusion that the associational discrimination cases that have arisen in the context of race should also apply to associational discrimination in terms of gender. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 243 n.9 (1989). While I explain my disagreement with this argument below, it is worth noting here why this footnote does not change the above analysis. The Court in *Price Waterhouse* did not state that every decision with regard to one enumerated group in Title VII must be applied blindly to every other group. Rather, it emphasized that the "principles" embedded in Title VII should apply with equal force to each enumerated category. *Id*. It is those principles that have allowed courts to interpret the various prohibitions in Title VII "against the background of . . . the historical context from which the Act arose," *United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201 (1979), in upholding distinctions between sexes that would unquestionably be rejected if made between races. And it is the principle of equal opportunity animating Title VII that I have attempted to distill in this opinion.

32

Representative Cellar's fears, without adverse consequences. But other distinctions based on sex remain, and their legality is either assumed, or at a minimum requires more thought than just "but that's a distinction based on sex, so it's illegal."

Distinctions based on personal privacy, for example, remain in place. When opponents of the ERA, like Senator Ervin, argued that under the ERA "there can be no exception for elements of publically [*sic*] imposed sexual segregation on the basis of privacy between men and women," 118 Cong. Rec. 9,564 (1972), that objection was derided by Senator Marlow Cook of Kentucky as the "potty" argument, *id.* at 9,531. Title VII too does not prohibit an employer from having separate men's and women's toilet facilities. Nor does it prohibit employer policies that differentiate between men and women in setting requirements regarding hair lengths. Thus, in *Longo v. Carlisle DeCoppet & Co.*, we held that a policy "requiring short hair on men and not on women" did not violate Title VII. 537 F.2d 685, 685 (2d Cir. 1976); *see also Tavora v. N.Y. Mercantile Exch.*, 101 F.3d 907, 908–09 (2d Cir. 1996) (same).

Dress codes provide a more complicated example. It is certainly arguable that some forms of separate dress codes further stereotypes harmful to workplace

equality for women; requiring female employees to wear "Hooters"-style outfits but male employees doing the same work to wear suit and tie would not stand scrutiny. But what of a pool facility that requires different styles of bathing suit for male and female lifeguards? Judge Cabranes's concurrence would seem to prohibit that practice, but I believe, and I expect Judge Cabranes would agree, that a pool that required both male and female lifeguards to wear a uniform consisting only of trunks would violate Title VII, while one that prescribed trunks for men and a bathing suit covering the breasts for women would not.

More controversial distinctions, such as different fitness requirements for men and women applying for jobs involving physical strength, have also been upheld. In a recent case, the Fourth Circuit rejected the notion that Title VII prohibits gender-normed physical fitness benchmarks pursuant to which male FBI agent trainees must perform 30 push-ups, while female trainees need only do 14. *Bauer v. Lynch*, 812 F.3d 340, 342, 351 (4th Cir.), cert. denied, 137 S. Ct. 372 (2016). In upholding this distinction, the court noted that of "the few decisions to confront the use of gender-normed physical fitness standards in the Title VII context, none has deemed such standards to be unlawful," *id.* at 348, because courts have recognized that some physiological differences between men and

women "impact their relative abilities to demonstrate the same levels of physical fitness," *id.* at 351. Thus, the court in *Bauer* recognized that to distinguish between the sexes is not always to discriminate against one or the other. Indeed, a *failure* to impose distinct fitness requirements for men and women may be found to violate Title VII, if it has a disparate impact on one sex and the employer cannot justify the requirement as a business necessity. *See Lanning v. Se. Pa. Transp. Auth. (SEPTA),* 181 F.3d 478, 494 (3d Cir. 1999) (applying Civil Rights Act of 1991 and finding that time cutoff for 1.5 mile run for officers had a disparate impact, when women had a pass rate of only 6.7%, compared to a 55.6% pass rate for men, and remanding to district court to determine whether the score represents "the minimum qualifications necessary for successful performance of the job in question"). Taken to its logical conclusion, though, the majority's interpretation of Title VII would do away with this understanding of the Act.

These examples suffice to illustrate two points relevant to the supposedly simple interpretation of sex-based discrimination relied upon by the majority. First, it is not the case that any employment practice that can only be applied by identifying an employee's sex is prohibited. Second, neither can it be the case that any discrimination that would be prohibited if race were the criterion is equally

prohibited when gender is used.[16] Obviously, Title VII does not permit an

employer to maintain racially segregated bathrooms, nor would it allow

different-colored or different-designed bathing costumes for white and black

lifeguards. Such distinctions would smack of racial subordination, and would

impose degrading differences of treatment on the basis of race. Precisely the

same distinctions between men and women would not.[17]

Nor does the example of "discrimination based on traits that are a function

of sex, such as life expectancy," Maj. Op. at 19, help the majority's cause.

Discrimination of that sort, as the majority notes, could permit gross

discrimination against female employees "by using traits that are associated with

sex as a proxy for sex." *Id*. at 19–20. That is certainly so as to "traits that are a

function of sex," such as pregnancy or the capacity to become pregnant. But it is

not so as to discrimination based on sexual orientation. Same-sex attraction is not

---

[16] That of course does not mean that "discriminate against" has any different meaning as applied to "because of . . . race" than it does as applied to "because of . . . sex." What it means is that similar, or even identical, practices may have a different social meaning and a different economic effect when they distinguish male from female employees than when they distinguish white from black employees.

[17] Despite the Times's concerns, the Rockettes remain all female more than 50 years after Title VII became law, and the owners of franchises in the Women's National Basketball Association are likely not very worried about losing a lawsuit by men who were not allowed to try out for employment with their teams. Needless to say, dance troupes or professional sports leagues that employed only whites or blacks would be quite a different matter.

"a function of sex" or "associated with sex" in the sense that life expectancy or childbearing capacity are.[18] A refusal to hire gay people cannot serve as a covert means of limiting employment opportunities for men or for women as such; a minority of both men and women are gay, and discriminating against them discriminates against *them*, as gay people, and does not differentially disadvantage employees or applicants of either sex.[19] That is not the case with other forms of "sex-plus" discrimination that single out for disfavored status traits that are, for example, common to women but rare in men.[20]

C

That "because of . . . sex" did not, and still does not, cover sexual orientation, is further supported by the movement, in both Congress and state

---

[18] To spell the point out: life expectancy, *see* Maj. Op. at 31–32, citing *L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702 (1978), may be quite literally a mathematical "function of sex," to the extent that with knowledge of a person's sex, one can calculate his or her life expectancy, which will differ from that of a member of the opposite sex. Whatever the majority means by its assertion that "sexual orientation is a function of sex," Maj. Op. at 37, it plainly does not mean anything like that.

[19] Although empirical data are hard to come by, there appears to be nothing to suggest that rates of homosexuality differ significantly between men and women. *See, e.g.*, Gary J. Gates, *In U.S., More Adults Identifying as LGBT*, Gallup (Jan. 11, 2017), http://news.gallup.com/poll/201731/lgbt-identification-rises.aspx.

[20] Of course, discrimination against a subcategory of members of one sex is also prohibited by Title VII. An employer that hires gay men but refuses to hire lesbians, or vice versa, would thus be in violation of the statute.

legislatures, to enact legislation protecting gay men and women against

employment discrimination. This movement, which has now been successful in

twenty-two states — including all three in our Circuit — and the District of

Columbia, has proceeded by expanding the categories of prohibited

discrimination in state anti-discrimination laws.[21] In none of those states did the

prohibition of sexual orientation discrimination come by judicial interpretation of

a pre-existing prohibition on gender-based discrimination to encompass

discrimination on the basis of sexual orientation. Similarly, the Executive Branch

has prohibited discrimination against gay men and lesbians in federal

employment by adding "sexual orientation" to previously protected grounds. *See*

Exec. Order No. 13087, 63 Fed. Reg 30,097 (May 28, 1998).[22] Finally, the same

---

[21] *See* Cal. Gov't Code § 12940 (California); Colo. Rev. Stat. § 24-34-402 (Colorado); Conn. Gen. Stat. § 46a-60 (Connecticut); Del. Code Ann. tit. 19, § 711 (Delaware); D.C. Code § 2-1402.11 (District of Columbia); Haw. Rev. Stat. § 378-2 (Hawaii); 775 Ill. Comp. Stat. 5/2-101, 102 (Illinois); Iowa Code § 216.6; Me. Rev. Stat. tit. 5, § 4571 (Maine); Md. Code Ann., State Gov't § 20-606 (Maryland); Mass. Gen. Laws ch. 151B, § 4 (Massachusetts); Minn. Stat. § 363A.08 (Minnesota); Nev. Rev. Stat. § 613.330 (Nevada); N.H. Rev. Stat. Ann. § 354-A:7 (New Hampshire); N.J. Stat. Ann. § 10:5-4 (New Jersey); N.M. Stat. Ann. § 28-1-7 (New Mexico); N.Y. Exec. Law § 296 (New York); Or. Rev. Stat. § 659A.003 (Oregon); R.I. Gen. Laws § 28-5-7 (Rhode Island); Vt. Stat. Ann. tit. 21, § 495 (Vermont); Wash. Rev. Code § 49.60.180 (Washington); Wis. Stat. § 111.321 (Wisconsin).

[22] Discrimination in federal employment on the basis of sex (as well as race, color, religion, and national origin) has been prohibited by executive order since 1969. *See* Exec. Order No. 11478, 34 Fed. Reg. 12,985 (Aug. 8, 1969). In 1998, the Clinton Administration did not argue that the prohibition of sex discrimination in that Order already banned, or henceforth would be deemed to ban, sexual orientation discrimination; rather, like the states that have

approach has been reflected in the repeated (but so far unsuccessful) introduction

of bills in Congress to add "sexual orientation" to the list of prohibited grounds

of employment discrimination in Title VII.[23]

---

prohibited such discrimination by all employers, it straightforwardly added sexual orientation to the prohibited categories.  *See* Exec. Order No. 13087.

[23] *See* Civil Rights Amendments Act, H.R. 166, 94th Cong. (1975); A Bill to Prohibit Discrimination on the Basis of . . . Sexual Preference, H.R. 2667, 94th Cong. (1975); Civil Rights Amendments, H.R. 5452, 94th Cong. (1975); Civil Rights Amendments, H.R. 13019, 94th Cong. (1976); Civil Rights Amendments, H.R. 451, 95th Cong. (1977); Civil Rights Amendments Act, H.R. 7775, 95th Cong. (1977); Civil Rights Amendments, H.R. 2998, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 4794, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 5239, 95th Cong. (1977); Civil Rights Amendments Act of 1977, H.R. 8269, 95th Cong. (1977); Civil Rights Amendments Act of 1979, H.R. 2074, 96th Cong. (1979); A Bill to Prohibit Employment Discrimination on the Basis of Sexual Orientation, S. 2081, 96th Cong. (1979); Civil Rights Amendments Act of 1981, H.R. 1454, 97th Cong.; Civil Rights Amendments Act of 1981, H.R. 3371, 97th Cong.; A Bill to Prohibit Discrimination on the Basis of Sexual Orientation, S. 1708, 97th Cong. (1981); A Bill to Prohibit Employment Discrimination on the Basis of Sexual Orientation, S. 430, 98th Cong. (1983); Civil Rights Amendments Act of 1983, H.R. 427, 98th Cong.; Civil Rights Amendments Act of 1983, H.R. 2624, 98th Cong.; Civil Rights Amendments Act of 1985, S. 1432, 99th Cong.; Civil Rights Amendments Act of 1985, H.R. 230, 99th Cong.; Civil Rights Amendments Act of 1987, S. 464, 100th Cong.; Civil Rights Amendments Act of 1987, H.R. 709, 100th Cong.; Civil Rights Protection Act of 1988, S. 2109, 100th Cong.; Civil Rights Amendments Act of 1989, S. 47, 101st Cong.; Civil Rights Amendments Act of 1989, H.R. 655, 101st Cong.; Civil Rights Amendments Act of 1991, S. 574, 102d Cong.; Civil Rights Amendments Act of 1991, H.R. 1430, 102d Cong.; Civil Rights Amendments Act of 1993, H.R. 423, 103d Cong.; Employment Nondiscrimination Act of 1994, S. 2238, 103d Cong.; Civil Rights Act of 1993,  H.R. 431, 103d Cong.; Employment Non-Discrimination Act of 1994, H.R. 1430, 103d Cong.; Civil Rights Amendments Act of 1995, H.R. 382, 104th Cong.; Employment Non-Discrimination Act of 1995, S. 932, 104th Cong.; Employment Non-Discrimination Act of 1995, H.R. 1863, 104th Cong.; Civil Rights Amendments Act of 1998,  H.R. 365, 105th Cong.; Employment Non-Discrimination Act of 1997, S. 869, 105th Cong.; Employment Non-Discrimination Act of 1997, H.R. 1858, 105th Cong.; Civil Rights Amendments Act of 1999, H.R. 311, 106th Cong.; Employment Non-Discrimination Act of 1999, S. 1276, 106th Cong.; Employment Non-Discrimination Act of 1999, H.R. 2355, 106th Cong.; Civil Rights Amendments Act of 2001, H.R. 217, 107th Cong.; Employment Non-Discrimination Act of 2001, H.R. 2692, 107th Cong.; Employment Non-Discrimination Act of 2002, S. 1284, 107th Cong.;

The Department of Justice argues, relying on *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, – U.S. –, 135 S. Ct. 2507 (2015), that Congress ratified judicial interpretations of "sex" in Title VII as excluding sexual orientation when it amended the Civil Rights Act in 1991 and failed to overrule judicial decisions holding that the sex discrimination provision of Title VII did not cover sexual orientation discrimination. *See* Brief of United States as *Amicus Curiae* 8–14. In *Inclusive Communities*, the Supreme Court held that disparate-impact claims are cognizable under the Fair Housing Act ("FHA"). 135 S. Ct. at 2525. In so holding, the Court found it relevant that Congress had amended the FHA after nine Courts of Appeals had held that the FHA allowed for disparate-impact claims, and did not alter the text of the Act in a way that would make it clear that disparate-impact claims were not contemplated by the FHA. *Id.* at 2519. Furthermore, the Court found it significant that the legislative

Equal Rights and Equal Dignity for Americans Act of 2003, S. 16, 108th Cong.; Employment Non-Discrimination Act of 2003, H.R. 3285, 108th Cong.; Employment Non-Discrimination Act of 2003, S. 1705, 108th Cong.; Civil Rights Amendments Act of 2005, H.R. 88, 109th Cong.; Employment Non-Discrimination Act of 2007, H.R. 2015, 110th Cong.; Employment Non-Discrimination Act of 2007, H.R. 3685, 110th Cong.; Employment Non-Discrimination Act of 2009, H.R. 3017, 111th Cong.; Employment Non-Discrimination Act of 2009, H.R. 2981, 111th Cong.; Employment Non-Discrimination Act of 2009, S. 1584, 111th Cong.; Employment Non-Discrimination Act, H.R. 1397, 112th Cong. (2011); Employment Non-Discrimination Act of 2011, S. 811, 112th Cong.; Employment Non-Discrimination Act of 2013, H.R. 1755, 113th Cong.; Employment Non-Discrimination Act of 2013, S. 815, 113th Cong.; Equality Act, H.R. 3185, 114th Cong. (2015); Equality Act, S. 1858, 114th Cong. (2015).

history of the FHA amendment made it clear that Congress was aware of those Court of Appeals decisions. *Id.* at 2519–20. The majority dismisses this argument because at the time of the 1991 amendment to the Civil Rights Act, only three Courts of Appeals[24] had ruled that Title VII did not cover sexual orientation, and Congress did not make clear, in the legislative history of the 1991 amendment, that it was aware of this precedent. Maj. Op. at 57–59.

In light of the clear textual and historical meaning of the sex provision that I have discussed above, I do not find it necessary to rely heavily on the more technical argument that strives to interpret the meaning of statutes by congressional actions and omissions that might be taken as ratifying Court of Appeals decisions. But I do think it is worth noting that the Supreme Court also found it relevant, in *Inclusive Communities*, that Congress had *rejected* a proposed amendment "that would have eliminated disparate-impact liability for certain zoning decisions." 135 S. Ct. at 2520. Here, while only three Courts of Appeals may have ruled on the issue by 1991, over twenty-five amendments had been proposed to add sexual orientation to Title VII between 1964 and 1991. All had

---

[24] *Williamson v. A.G. Edwards and Sons, Inc.*, 876 F.2d 69 (8th Cir. 1989); *DeSantis v. Pac. Telephone and Telegraph Co., Inc.*, 608 F.2d 327 (9th Cir. 1979); *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979).

been rejected. In fact, two amendments were proposed in 1991, one in the House and one in the Senate, Civil Rights Amendments Act of 1991, S. 574, 102d Congress; Civil Rights Amendments Act of 1991, H.R. 1430, 102d Congress, and neither of those amendments found its way into the omnibus bill that overruled other judicial interpretations of the Civil Rights Act. Moreover, in addition to the three Courts of Appeals that had ruled on the issue, the EEOC — the primary agency charged by Congress with interpreting and enforcing Title VII — had also held, by 1991, that sexual orientation discrimination fell "outside the purview of Title VII." *Dillon v. Frank*, EEOC Doc. No. 01900157, 1990 WL 1111074, at *3 (Feb. 14, 1990).

Thus, to the extent that we can infer the awareness of Congress at all, the continual attempts to add sexual orientation to Title VII, as well as the EEOC's determination regarding the meaning of sex, should be considered, in addition to the three appellate court decisions, as evidence that Congress was unquestionably aware, in 1991, of a general consensus about the meaning of "because of . . . sex," and of the fact that gay rights advocates were seeking to change the law by adding a new category of prohibited discrimination to the statute.

Although the Supreme Court has rightly cautioned against relying on legislative inaction as evidence of congressional intent, because "several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change," *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990) (internal quotation marks omitted), surely the proposal and rejection of over fifty amendments to add sexual orientation to Title VII means something. *Supra* note 23. And it is pretty clear what it does *not* mean. It is hardly reasonable, in light of the EEOC and judicial consensus that sex discrimination did not encompass sexual orientation discrimination, to conclude that Congress rejected the proposed amendments because senators and representatives believed that Title VII "already incorporated the offered change." *Pension Benefit Guar. Corp.*, 496 U.S. at 650. There may be many reasons why each proposal ultimately failed, but it cannot reasonably be claimed that the basic reason that Congress did not pass such an amendment year in and year out was anything other than that there was not yet the political will to do so.

This last point requires one further disclaimer. As with the social *pre-history* of Title VII, these later developments are not referenced in a dubious

effort to infer the specific intentions of the members of Congress who voted for the Smith amendment in 1964, nor are they referenced to infer the specific intent of each Congress that was faced with proposed sexual orientation amendments. The point, rather, is that race, gender, and sexual orientation discrimination have been consistently perceived in the political world, and by the American population as a whole, as different practices presenting different social and political issues. At different times over the last few generations, the recognition of each as a problem to be remedied by legislation has been controversial, with the movements to define each form of discrimination as illegal developing at a different pace and for different reasons, and being opposed in each case by different coalitions for different reasons. To recognize this fact is to understand that discrimination against persons based on sex has had, in law and in politics, a meaning that is separate from that of discrimination based on sexual orientation.[25]

---

[25] This is by no stretch of the imagination an outlier position, past or present. As the majority recognizes, until just last year, when the Seventh Circuit decided *Hively*, 853 F.3d at 340, this interpretation of the sex provision prevailed, unanimously, in federal courts of appeals nationwide. Maj. Op. at 7–8 (citing the "consensus among our sister circuits" that "because of . . . sex" did not cover sexual orientation, and listing eight Court of Appeals decisions so holding). Specifically, eleven Circuit Courts, including ours, had considered the question, and all had concluded that, by its terms, Title VII does not prohibit sexual orientation discrimination. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999); *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217–18 (2d Cir. 2005); *Bibby v. Phila. Coca Cola Bottling Co.*, 260 F.3d 257,

In short, Title VII's prohibition of employment discrimination against

individuals on the basis of their sex is aimed at employment practices that

differentially disadvantage men vis-à-vis women or women vis-à-vis men. That is

what the language of the statute means to an ordinary "fluent speaker of the

English language," *Hively*, 853 F.3d at 363 (Sykes, *J.*, dissenting), that is the social

practice that Congress chose to legislate against, and in light of that

understanding, certain laws and practices that distinguish between men and

women have been found to violate Title VII, and certain others have not.

Discrimination against persons whose sexual orientation is homosexual rather

than heterosexual, however offensive such discrimination  may be to me and to

many others, is not discrimination that treats men and women differently. The

simplistic argument that discrimination against gay men and women is sex

---

261 (3d Cir. 2001); *Wrightson v. Pizza Hut of Am., Inc.*, 99 F.3d 138, 143 (4th Cir. 1996); *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979); *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 471 (6th Cir. 2012); *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 708 (7th Cir. 2000); *Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989); *DeSantis*, 608 F.2d at 329–30; *Medina v. Income Support Div.*, 413 F.3d 1131, 1135 (10th Cir. 2005); *Evans v. Georgia Reg'l Hosp.*, 850 F.3d 1248, 1255 (11th Cir. 2017). As noted above, the EEOC had also concluded that sexual orientation fell "outside the purview of Title VII." *Dillon*, 1990 WL 1111074, at *3. It was not until 2015 that the EEOC ruled, for the first time, that Title VII should be interpreted to cover sexual orientation, *Baldwin v. Foxx*, EEOC Decision No. 0120133080, 2015 WL 4397641, at *5 (July 15, 2015), and its position is opposed by the Department of Justice, which also has responsibility for enforcing statutes prohibiting sex discrimination. *See* Brief of the United States as *Amicus Curiae* 1.

discrimination because targeting persons sexually attracted to others of the same sex requires *noticing* the gender of the person in question is not a fair reading of the text of the statute, and has nothing to do with the type of unfairness in employment that Congress legislated against in adding "sex" to the list of prohibited categories of discrimination in Title VII.

## III

The majority opinion goes on to identify two other arguments in support of its holding: (1) that sexual orientation discrimination is actually "gender stereotyping" that constitutes discrimination against individuals based on their sex, and (2) that such discrimination constitutes prohibited "associational discrimination" analogous to discriminating against employees who are married to members of a different race.

These arguments have the merit of attempting to link discrimination based on sexual orientation to the social problem of gender discrimination at which Title VII is aimed. But just as the "differential treatment" argument attempts to shoehorn sexual orientation discrimination into the statute's verbal template of discrimination based on sex, these arguments attempt a similar (also unsuccessful) maneuver with lines of case law. While certain Supreme Court

46

cases identify clear-cut examples of sex or race discrimination that may have a superficial similarity to the practice at issue here, the majority mistakes that similarity for a substantive one.

A

Perhaps the most appealing of the majority's approaches is its effort to treat sexual orientation discrimination as an instance of sexual stereotyping. The argument proceeds from the premises that "sex stereotyping violates Title VII," Maj. Op. at 40, and that "same-sex orientation 'represents the ultimate case of failure to conform' to gender stereotypes," *id*. 41, quoting *Hively*, 853 F.3d at 346, and concludes that an employer who discriminates against gay people is therefore "sex stereotyping" and thus violating Title VII. But like the other arguments adopted by the majority, this approach rests more on verbal facility than on social reality.

In unpacking the majority's syllogism, it is first necessary to address what we mean by "sex stereotyping" that "violates Title VII." Invidious stereotyping of members of racial, gender, national, or religious groups is at the heart of much employment discrimination. Most employers do not entertain, let alone admit to, older forms of racialist or other discriminatory ideologies that hold that members

of certain groups are inherently or genetically inferior and undeserving of equal treatment. Much more common are assumptions, not always even conscious, that associate certain negative traits with particular groups. A perception that women, for example, are not suited to executive positions, or are less adept at the mathematical and practical skills demanded of engineers, can be a significant hindrance to women seeking such positions, even when a particular woman is demonstrably qualified, or indeed even where empirical data show that on average women perform as well as or better than men on the relevant tasks. Refusing to hire or promote someone because of that sort of gender (or racial, or ethnic, or religious) stereotyping is not a separate form of sex (or race, or ethnic, or religious) discrimination, but is precisely discrimination in hiring or promotion based on sex (or race, or ethnicity, or religion). It treats applicants or employees not as individuals but as members of a class that is disfavored for purposes of the employment decision by reason of a trait stereotypically assigned to members of that group as a whole. For the most part, then, the kind of stereotyping that leads to discriminatory employment decisions that violate Title VII is the assignment of traits that are negatively associated with job performance (dishonesty, laziness, greed, submissiveness) to members of a particular

protected class.

Clearly, sexual orientation discrimination is not an example of that kind of sex stereotyping; an employer who disfavors a male job applicant whom he believes to be gay does not do so because the employer believes that most men are gay and therefore unsuitable. Rather, he does so because he believes that most *gay* people (whether male or female) have some quality that makes them undesirable for the position, and that because this applicant is gay, he must also possess that trait. Although that is certainly stereotyping, and invidiously so, it does not stereotype a group protected by Title VII, and is therefore not (yet) illegal.

But as the majority correctly points out, that is not the only way in which stereotyping can be an obstacle to protected classes of people in the workplace. The stereotyping discussed above involves beliefs about how members of a particular protected category *are*, but there are also stereotypes (or more simply, beliefs) about how members of that group *should be*. In the case of sex discrimination in particular, stereotypes about how women ought to look or behave can create a double bind. For example, a woman who is perceived through the lens of a certain "feminine" stereotype may be assumed to be

insufficiently assertive for certain positions by contrast to men who, viewed through the lens of a "masculine" stereotype, are presumed more likely to excel in situations that demand assertiveness. At the same time, the employer may fault a woman who behaves as assertively as a male comparator for being *too* aggressive, thereby failing to comply with societal expectations of femininity.

That is the situation that a plurality of the Supreme Court identified in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the key case the majority relies on for its "sex stereotyping" argument. As that opinion pointed out, "[a]n employer who objects to aggressiveness in women but whose positions require this trait places women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not. Title VII lifts women out of this bind." *Id*. at 251. The two horns of the dilemma described in *Price Waterhouse* have slightly different, yet equally problematic, sexist foundations: a female employee or applicant may be prejudiced by a negative assumption that women *aren't* or *can't be* sufficiently dominant for a position that requires leadership or strength or aggression, but when a woman unquestionably does show the putatively desired traits, she is held back because of the different but related notion that women *shouldn't be* aggressive or dominant. The latter is not an

assumption about how *most* women *are*, it is a normative belief about how *all* women *should be*.

I fully accept the conclusion that that kind of discrimination is prohibited, and that it imposes different conditions of employment on men and on women. Not only does such discrimination require women to behave differently in the workplace than men, but it also actively deters women from engaging in kinds of behavior that are required for advancement to certain positions, and thus effectively bars them from such advancement. The key element here is that one sex is systematically disadvantaged in a particular workplace. In that circumstance, sexual stereotyping is sex discrimination.[26]

But as Judge Sykes points out in her *Hively* dissent, the homophobic employer is not deploying a stereotype about men or about women to the disadvantage of either sex. Such an employer is expressing disapproval of the behavior or identity of a class of people that includes both men and women. 853 F.3d at 370. That disapproval does not stem from a desire to discriminate against

---

[26] The same type of discrimination could affect men in a job environment in which stereotypically "feminine" traits such as empathy are required. On the authority of *Price Waterhouse*, Title VII would prohibit an employer from discriminating against male social workers in hiring or promotion *either* based on a stereotypical assumption that men are in general insufficiently caring *or* because of a prejudice against men who do display such putatively feminine qualities.

either sex, nor does it result from any sex-specific stereotype, nor does it differentially harm either men or women vis-à-vis the other sex. Rather, it results from a distinct type of objection to anyone, of whatever gender, who is identified as homosexual. The belief on which it rests is not a belief about what men or women ought to be or do; it is a belief about what *all* people ought to be or do — to be heterosexual, and to have sexual attraction to or relations with only members of the opposite sex. That does not make workplace discrimination based on this belief better or worse than other kinds of discrimination, but it does make it something different from sex discrimination, and therefore something that is not prohibited by Title VII.

B

The "associational discrimination" theory is no more persuasive. That theory rests on cases involving race discrimination.[27] Many courts have found that Title VII prohibits discrimination in cases in which, as in our case of *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008), a white plaintiff alleged that he was fired because he was married to a person of a different race.

It would require absolute blindness to the history of racial discrimination

---

[27] Other than the Seventh Circuit's decision in *Hively*, 853 F.3d at 347–49, no federal appellate court has applied this theory outside of the context of racial discrimination cases.

in this country not to understand what is at stake in such cases, and why such allegations unmistakably state a claim of discrimination against an individual employee on the basis of race. Anti-miscegenation laws constituted a bulwark of the structure of institutional racism that is the paradigm of invidious discrimination in this country. African-Americans were condemned first to slavery, and then to second-class citizenship and virtual apartheid, on the basis of an ideology that regarded them as inferior. Such an ideology is incompatible with fraternization, let alone marriage and reproduction, between African-Americans and whites. A prohibition on "race-mixing" was thus grounded in bigotry against a particular race and was an integral part of preserving the rigid hierarchical distinction that denominated members of the black race as inferior to whites.

Thus, as the Supreme Court noted in striking down Virginia's law prohibiting marriage between a white person and a person of color, the Supreme Court of Virginia had upheld the statute because Virginia defined its "legitimate" purposes as "'preserv[ing] the racial integrity of [the state's] citizens,' and [] prevent[ing] 'the corruption of blood,' 'a mongrel breed of citizens,' and 'the obliteration of racial pride,'" purposes the Court correctly identified and rejected

as "obviously an endorsement of the doctrine of White Supremacy." *Loving v. Virginia*, 388 U.S. 1, 7 (1967), quoting *Naim v. Naim*, 87 S.E.2d 749, 756 (Va. 1955). The racist hostility to "race-mixing" extended well beyond a prohibition against interracial marriage. The beatings of "freedom riders" attempting to integrate interstate bus lines in the South in the early 1960s, inflicted on white as well as black participants in the protests, demonstrated that racial bigotry against African-Americans manifested itself in direct attacks not only on African-Americans, but also on whites who associated with African-Americans as equals. The entire system of "separate but equal" segregation in both state-owned and private facilities and places of public accommodation was designed, as Charles Black made plain in a classic deconstruction of the legal fiction of "separate but equal," to confine black people to "a position of inferiority." Charles Black, *The Lawfulness of the Segregation Decision*, 69 Yale L.J. 421, 424 (1960). Thus, the associational discrimination reflected in cases such as *Loving* and *Holcomb* was a product of bigotry against a single race by another. That discrimination is expressly prohibited in employment by Title VII.

Workplace equality for racial minorities is thus blatantly incompatible with a practice that ostracizes, demeans, or inflicts adverse conditions on white

employees for marrying, dating, or otherwise associating with, people of color.

The prohibition of that kind of discrimination is not simply a matter of noting

that, in order to effectuate it, the employer must identify the races of the

employee and the person(s) with whom he or she associates. Just as sexual

harassment against female employees presents a serious obstacle to the full and

equal participation of women in the workplace, discrimination against members

of a favored race who so much as associate with persons of another race reflects a

deep-seated bigotry against the disfavored race(s) that Title VII undertakes to

banish from the workplace. The principle was well stated by the Sixth Circuit in a

case cited by the majority, *Barrett v. Whirlpool Corporation*:

> Title VII protects individuals who, though not members
> of a protected class, are victims of discriminatory
> animus toward protected third persons with whom the
> individuals associate.

556 F.3d 502, 512 (6th Cir. 2009) (internal quotation marks and brackets

omitted).[28]

---

[28] The majority quotes this passage from *Barrett*, italicizing "protected class," in an effort to suggest that the Sixth Circuit, like the Seventh, has applied this principle to sex discrimination. Maj. Op. at 50. It has not. *Barrett* was a race discrimination case. To the extent that the formulation used could be read to extend beyond race, it is dictum. As will be made clear momentarily, it is not dictum to which I object, but it is one that, properly understood, has no application to the present case.

Discrimination on the basis of sexual orientation, however, is not discrimination of the sort at issue in *Holcomb* and *Barrett*. In those cases, the plaintiffs alleged that they were discriminated against because the employer was biased — that is, had a "discriminatory animus" — *against members of the race with whom the plaintiffs associated*. There is no allegation in this case, nor could there plausibly be, that the defendant discriminated against Zarda because it had something against *men*, and therefore discriminated not only against men, but also against anyone, male or female, who associated with them. I have no trouble assuming that the principle of *Holcomb* and *Barrett* applies beyond the category of race discrimination: an employer who fired or refused to promote an Anglo-American, Christian employee because she associated with Latinos or Jews would presumably run afoul of that principle just as much as one whose animus ran against black Americans. Such an employer would clearly be discriminating against the employee on the basis of her friends' ethnicity or religion — in the formulation from the *Barrett* opinion, that employer would be victimizing an employee out of "discriminatory animus toward protected third persons with whom the [employee] associate[d]." 556 F.3d at 512 (internal quotation marksand

alterations omitted).[29]

It is more difficult to imagine realistic hypotheticals in which an employer discriminated against anyone who so much as associated with men or with women, though I suppose academic examples of such behavior could be conjured. But whatever such a case might look like, discrimination against gay people is not it. Discrimination against gay men, for example, plainly is not rooted in animus toward "protected third persons with whom [they] associate." *Id.*, 556 F.3d at 512. An employer who practices such discrimination is hostile to gay men, not to men in general; the animus runs not, as in the race and religion cases discussed above, against a "protected group" to which the employee's associates belong, but against an (alas) *unprotected* group to which they belong: other gay men.[30]

The majority tries to rebut this straightforward distinction in various ways. First, it notes — but declines to rely on — academic "research suggesting that

---

[29] Furthermore, the principle that prohibitions against discrimination equally protect members of the socially dominant group in situations in which they are victims of discrimination would apply the same rule to a Jewish or black employer who discriminated against Jewish or black employees who married or associated with Christians or whites.

[30] The majority twits "[c]ertain *amici*" for failing to offer "empirical support" for a comparable assertion. Maj. Op. at 54. I doubt that a fair-minded reader needs any for the proposition I have stated.

sexual orientation discrimination has deep misogynistic roots." Maj. Op. at 54. It

is certainly plausible to me that the "deep roots" of hostility to homosexuals are

in some way related to the same sorts of beliefs about the proper roles of men

and women in family life that underlie at least some employment discrimination

against women. *See, e.g.*, Andrew Koppelman, *Why Discrimination Against*

*Lesbians and Gay Men Is Sex Discrimination*, 69 N.Y.U. L. Rev. 197, 234 (1994)

(noting that "[i]t should be clear from ordinary experience that the stigmatization

of the homosexual has *something* to do with the homosexual's supposed deviance

from traditional sex roles") (emphasis in original). It may also be that the "roots"

of all forms of discrimination against people who are different in some way from

a socially defined dominant group can be found in similar psychological

processes of discomfort with change or difference, or with "authoritarian

personality traits"[31] — or that there are other links among different forms of

prejudice. And it can plausibly be argued that homosexual men have historically

been derided because they were seen as abdicating their masculinity, and

therefore the advantage they have over women. *See, e.g.*, Joseph H. Pleck, *Men's*

---

[31] Sociologists have theorized that individuals with authoritarian personalities are most likely to be prejudiced against marginalized groups because they are rigid thinkers who obey authority, see the world as black and white, and enforce strict adherence to social hierarchies. Theodor W. Adorno et al., *The Authoritarian Personality* 228 (1st ed. 1950).

*Power with Women, Other Men, and Society: A Men's Movement Analysis, in* The American Man 417, 424 (Elizabeth H. Pleck & Joseph H. Pleck eds., 1980).

But the majority is right not to go searching for such roots, whatever they might be, because legislation is not typically concerned, and Title VII manifestly is not concerned, with defining and eliminating the "deep roots" of biased attitudes. Congress legislates against concrete behavior that represents a perceived social problem. Title VII does not prohibit "misogyny" or "sexism," nor does it undertake to revise individuals' ideas (religious or secular) about how families are best structured. Rather, it prohibits overt acts: discrimination in hiring, promotion, and the terms and conditions of employment based on sex.[32] Similarly, states, like those in our Circuit, that have prohibited discrimination based on sexual orientation do not seek to eradicate disapproval of homosexual practices (whether rooted in religious belief or misogyny or some other theory, or caused by some conditioned or other visceral reaction). People may believe what they like, but they may not discriminate in employment against those whose

---

[32] This is not to deny that such legislation may be supported in part by the hope that once individuals from different backgrounds have occasion to interact with one another, they will see beyond stereotypes and preconceived notions about how an entire class of people "is," and the ignorance and bigotry that initially motivated discrimination will be lessened. But any such purpose cannot warrant extending the categories of discrimination that Congress has outlawed to any other category that shares similar "roots" to prohibited practices.

characteristics or behaviors place them within the ambit of a protected category. Unlike those states, though, Congress has not enacted such a prohibition, and the fact that some of us believe that sexual orientation discrimination is unfair for much the same reasons that we disapprove of sex discrimination does not change that reality.

Second, the majority suggests that my analysis of associational discrimination is "squarely foreclosed by" cases like *Oncale*. Maj. Op. at 55. It is not. As noted above, I do not maintain that Title VII prohibits only those practices that its framers might have been principally concerned with, or only what was "traditionally," *id.*, seen as sex discrimination. To reiterate: sexual harassment plays a large role in hindering women's entry into, and advancement in, the workplace, and thus it is no surprise that courts have interpreted Title VII to prohibit it. And because Title VII protects both men and women from such practices, it does not matter whether the victim is male or female. Sexual harassment in the workplace quite literally imposes conditions of employment on one sex that are not imposed on the other, and it does not matter whether the employer who perpetrates such discriminatory disadvantage is male or female, or of the same or different sex than the employee. The victim of discrimination in

such situations is selected by his or her sex, and the disadvantage is imposed on him or her by reason of his or her membership in the protected class. It is not a question of what is "traditionally conceptualized as sexism." Maj. Op. at 55. It is a question of the public meaning of the words adopted by Congress in light of the social problem it was addressing when it chose those words.

## C

In the end, perhaps all of these arguments, on both sides, boil down to a disagreement about how discrimination on the basis of sexual orientation should be conceptualized. Whether based on linguistic arguments or associational theories or notions of stereotyping, the majority's arguments attempt to draw theoretical links between one kind of discrimination and another: to find ways to reconceptualize discrimination on the basis of sexual orientation as discrimination on the basis of sex. It is hard to believe that there would be much appetite for this kind of recharacterization if the law expressly prohibited sexual orientation discrimination, or that any opponent of sexual orientation discrimination would oppose the addition of sexual orientation to the list of protected characteristics in Title VII on the ground that to do so would be redundant or would express a misunderstanding of the nature of discrimination

61

against men and women who are gay. I believe that the vast majority of people in our society — both those who are hostile to homosexuals and those who deplore such hostility —  understand bias against or disapproval of those who are sexually attracted to persons of their own sex as a distinct type of prejudice, and not as merely a form of discrimination against either men or women on the basis of sex.

The majority asserts that discrimination against gay people is nothing more than a subspecies of discrimination against one or the other gender. Discrimination against gay men and lesbians is wrong, however, because it denies the dignity and equality of gay men and lesbians, and not because, in a purely formal sense, it can be said to treat men differently from women. It is understandable that those who seek to achieve legal protection for gay people victimized by discrimination search for innovative arguments to classify workplace bias against gays as a form of discrimination that is already prohibited by federal law. But the arguments advanced by the majority ignore the evident meaning of the language of Title VII, the social realities that distinguish between the kinds of biases that the statute sought to exclude from the workplace from those it did not, and the distinctive nature of anti-gay prejudice. Accordingly,

much as I might wish it were otherwise, I must conclude that those arguments

fail.

IV

The law with respect to the rights of gay people has advanced considerably

since 1964. Much of that development has been by state legislation. As noted

above, for example, twenty-two states now prohibit, by explicit legislative

pronouncement, employment discrimination on the basis of sexual orientation.

*See supra* note 21. But other advances have come by means of Supreme Court

decisions interpreting the Constitution. Perhaps the most striking advance, from

the vantage of the early 1960s, has been the legalization of same-sex marriage as a

matter of constitutional law.[33]

Nothing that I have said in this opinion should be interpreted as

expressing any disagreement with the line of cases running from *Lawrence v.

Texas*, 539 U.S. 558 (2003) (invalidating criminal prohibitions of consensual sexual

relations between members of the same sex), through *Obergefell v. Hodges*, – U.S.

–, 135 S. Ct. 2584 (2015) (holding that persons of the same sex have a

---

[33] Both the majority, *see* Maj. Op. at 66–67 n.33, and Judge Sack, *see* Concurring Op. of Sack, *J.*, at 1, cite these dramatic, and to me welcome, changes in the law. But these changes, both legislative and constitutional, stem from changes in social attitudes toward gay people, not from any change in, or improved understanding of, the meaning of "sex discrimination."

constitutional right to marry). But those cases provide no support for the

plaintiff's position in this case, or for the method of interpretation utilized by the

majority.

For one thing, it is noteworthy that none of the Supreme Court's landmark

constitutional decisions upholding the rights of gay Americans depend on the

argument that laws disadvantaging homosexuals constitute merely a species of

the denial of equal protection of the laws on the basis of gender, or attempt to

assimilate discrimination against gay people to the kinds of sex discrimination

that were found to violate equal protection in cases like *Frontiero v. Richardson*,

411 U.S. 677 (1973), *Craig v. Boren*, 429 U.S. 190 (1976), and *Orr v. Orr*, 440 U.S. 268

(1979), in the 1970s.[34] Instead, the Court's gay rights cases were based on the

guarantee of "liberty" embodied in the Fourteenth Amendment.

There is also a more fundamental difference. The Supreme Court's

decisions in this area are based on the Constitution of the United States, rather

than a specific statute, and the role of the courts in interpreting the Constitution

---

[34] That is particularly noteworthy given that one of the pioneering academic assertions of a right to same-sex marriage argued that the prohibition of discrimination based on sex in the Equal Rights Amendment (then before the states for ratification) would invalidate laws prohibiting same-sex marriage. Note, *The Legality of Homosexual Marriage*, 82 Yale L.J. 573, 583–88 (1973).

is distinctively different from their role in interpreting acts of Congress. There are several reasons for this.

First, the entire point of the Constitution is to delimit the powers that have been granted by the people to their government. Our Constitution creates a republican form of government, in which the democratically elected representatives of the majority of the people are granted the power to set policy. But the powers of those representatives are constrained by a written text, which prevents a popular majority — both in the federal Congress and, since the Civil War Amendments, in state legislatures — from violating certain fundamental rights. As every law student reads in his or her first-year constitutional law class, "[t]he powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176 (1803). To the extent that the courts exercise a non-democratic or counter-majoritarian power, they do so in the name of those rights. *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 495 (1989) (quoting *United States v. Carolene Products*, 304 U.S. 144, 153 n.4 (1938) to explain that "one aspect of the judiciary's role under the Equal Protection Clause is to protect 'discrete and insular minorities' from majoritarian prejudice or indifference"). Particular

exercises of that power, including the gay rights decisions of this new millennium, may be controversial, and fierce disagreements exist over the legitimacy of various methods of constitutional interpretation. And it is *not* controversial that the power to assess the constitutionality of legislation must be exercised with restraint, and with a due deference to the judgments of elected officials who themselves have taken an oath to defend the Constitution. But it has long been generally accepted that the courts have a special role to play in defending the liberties enshrined in the Constitution against encroachment even by the people's elected representatives. *See City of Boerne v. Flores*, 521 U.S. 507, 536 (1997) (explaining that "Congress' discretion [to enact legislation] is not unlimited, however, and the courts retain the power, as they have since *Marbury v. Madison*, to determine if Congress has exceeded its authority under the Constitution").

Within the limits imposed by constitutional principles, however, the will of the majority, as expressed in legislation adopted by the people's representatives, governs. As the Supreme Court has instructed, the role of courts with respect to statutes is simply "to apply the statute as it is written — even if we think some other approach might accord with good policy." *Sandifer v. U.S. Steel Corp.*, – U.S.

–, 134 S. Ct. 870, 878 (2014), quoting *Burrage v. United States*, – U.S. –, 134 S. Ct. 881, 892 (2014). Just last Term, a unanimous Supreme Court foreclosed judicial efforts to "update" statutes, declaring that, although "reasonable people can disagree" whether, following the passage of time, "Congress should reenter the field and alter the judgments it made in the past[,] . . . the proper role of the judiciary in that process . . . [is] to apply, not amend, the work of the People's representatives." *Henson v. Santander Consumer USA Inc.*, – U.S. –, 137 S. Ct. 1718, 1725–26 (2017). In interpreting statutes, courts must not merely show deference or restraint; their obligation is to do their best to understand, in a socially and politically realistic way, what decisions the democratic branches of government have embodied in the language they voted for (and what they have not), and to interpret statutes accordingly in deciding cases.

Second, the rights conferred by the Constitution are written in broad language. As the great Chief Justice Marshall commented, our Constitution is "one of enumeration, and not of definition." *Gibbons v. Ogden*, 22 U.S. 1, 72 (1824). Examples are easily cited: The Constitution does not contain a list of specific punishments that are too cruel to be imposed; it prohibits, in general language, "cruel and unusual punishments." U.S. Const. amend. VIII. It does not enact a

code of police procedure that explains exactly what kinds of searches the police may conduct, under what particular circumstances; it prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. It does not, as relevant here, identify particular types of discriminatory actions by state governments that it undertakes to forbid; it demands that those governments provide to all people within our borders "the equal protection of the laws." U.S. Const. amend. XIV.

Legislation, in contrast, can and often does set policy in minute detail. It does not necessarily concern itself with deep general principles. Rather, legislators are entitled to pick and choose which problems to address, and how far to go in addressing them. Within the limits of constitutional guarantees, Congress is given "wide latitude" to legislate, *City of Boerne*, 521 U.S. at 520, but courts must struggle to define those limits by giving coherent meaning to broad constitutional principles. The majestic guarantee of equal protection in the Fourteenth Amendment is a very different kind of pronouncement than the prohibition, in Title VII, of specific kinds of discrimination, by a specified subset of employers, based on clearly defined categories. The language of the Constitution thus allows a broader scope for interpretation.

Third, and following in part from above, the Constitution requires some

flexibility of interpretation, because it is intended to endure; it was deliberately

designed to be difficult to amend.[35] It is difficult to amend because the framers

believed that certain principles were foundational and, for practical purposes, all

but eternal, and should not be subject to the political winds of the moment. A

constitution is, to quote Chief Justice Marshall yet again, "framed for ages to

come, and is designed to approach immortality as nearly as human institutions

can approach it." *Cohens v. State of Virginia*, 19 U.S. 264, 387 (1821). The choice of

broad language reflects the framers' goal: they did not choose to prohibit "cruel

and unusual punishments," rather than listing prohibited punishments, simply to

save space, on the assumption that future courts could consult extra-

constitutional sources to identify what particular penalties they had in mind; they

did so in order to enshrine a general principle, leaving its instantiation and

elaboration to future interpreters.

Those enduring principles would not, could not, endure if they were

incapable of adaptation — at times via judicial interpretation — to new social

circumstances, as well as new understandings of old problems. That idea is not

---

[35] Scholars have noted that an exceedingly small fraction of the population could conceivably block ratification of a constitutional amendment, despite overwhelming majority support for such an amendment. *See, e.g.*, Akhil Reed Amar, *Philadelphia Revisited: Amending the Constitution Outside Article V*, 55 U. Chi. L. Rev. 1043, 1060 (1988).

new. In 1910, the Supreme Court wrote, in the context of the Eighth Amendment, that "[t]ime works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth. This is peculiarly true of constitutions." *Weems v. United States*, 217 U.S. 349, 373 (1910). More recently, in *Obergefell*, the Court noted that "in interpreting the Equal Protection Clause, the Court has recognized that new insights and societal understandings can reveal unjustified inequality within our most fundamental institutions that once passed unnoticed and unchallenged." 135 S. Ct. at 2603.

Legislation, on the other hand, is not intended to last forever. It must be consistent with constitutional principles, and ideally it will be inspired by a principled concept of ordered liberty. But it nevertheless remains the domain of practical political compromise. Congress and the state legislatures are in frequent session, and are capable — notwithstanding criticisms of "gridlock" and praise of "checks and balances" — of acting to repeal, extend, or modify prior enactments. In interpreting the Constitution, courts speak to the ages; in interpreting legislation, federal courts speak to — and essentially for — Congress, which can always correct our mistakes, or revise legislation in light of changing political and

social realities.

Finally, the Constitution, as noted above, is designed, with very limited exceptions,[36] to govern the government. The commands of equal protection and respect for liberties that can only be denied by due process of law tell us how a government must behave when it regulates the people who created it. Legislation, however, generally governs the people themselves, in their relation with each other.

The question of how the government, acting at the behest of a possibly temporary political majority, is permitted to treat the people it governs, is a different question, and is answered by reference to different principles, than the question of what obligations should be imposed on private citizens. The former question must ultimately be answered by courts under the principles adopted in the Constitution. The latter is entrusted primarily to the legislative process. Courts interpreting statutes are not in the business of imposing on private actors new rules that have not been embodied in legislative decision. It is for that reason

---

[36] A significant exception is the Thirteenth Amendment, which "[b]y its own unaided force . . . abolished slavery, and established universal freedom." *Civil Rights Cases*, 109 U.S. 3, 20 (1883); *see Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 437–44 (1968) (explaining that the Amendment reaches, and authorizes Congress to reach in implementing legislation, private conduct).

that segregation in public facilities was struck down by constitutional command,

long before segregation of private facilities was prohibited by federal legislation

adopted by Congress. Whether or not the Fifth and Fourteenth Amendments

have something to say about whether *the state and federal governments* may

discriminate in employment against gay Americans — a question that is not

before us, and about which I express no view — it is the prerogative of Congress

or a state legislature to decide whether private employers may do so.

In its *amicus* submission, the EEOC quite reasonably asks whether it is just

that a gay employee can be married on Sunday, and fired on Monday —

discriminated against at his or her job for exercising a right that is protected by

the Constitution. Brief of the Equal Employment Opportunity Commission as

*Amicus Curiae* 22.[37] I would answer that it is not just. But at the same time, I

recognize that the law does not prohibit every injustice. The Constitution protects

the liberty of gay people to marry against deprivation by their government, but it

does not promise freedom from discrimination by their fellow citizens. That is

hardly a novel proposition: absent Title VII, the same injustice could have been

inflicted on the Lovings themselves. The Constitution protected them against

---

[37] The majority notes the same "paradox." Maj. Op. at 66–67 n.33.

*governmental* discrimination, but (except for specific vestiges of slavery prohibited by the Thirteenth Amendment) only an act of Congress can prohibit one individual from discriminating against another in housing, public accommodations, and employment. It is well to remember that whether to prohibit race and sex discrimination was a controversial political question in 1964. Imposing an obligation on private employers to treat women and minorities fairly required political organizing and a political fight.

At the end of the day, to paraphrase Chief Justice Marshall, in interpreting statutes we must never forget that it is *not* a Constitution we are expounding. *Cf. M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819). When interpreting an act of Congress, we need to respect the choices made by Congress about which social problems to address, and how to address them. In 1964, Congress — belatedly — prohibited employment discrimination based on race, sex, religion, ethnicity, and national origin. Many states have similarly recognized the injustice of discrimination on the basis of sexual orientation. In doing so, they have called such discrimination by its right name, and taken a firm and explicit stand against it. I hope that one day soon Congress will join them, and adopt that principle on a national basis. But it has not done so yet.

For these reasons, I respectfully, and regretfully, dissent.[38]

---

[38] For the record, I note that I fully agree with the majority's discussion of our jurisdiction, Maj. Op. at 14–17.

DEBRA ANN LIVINGSTON, *Circuit Judge*, dissenting:

I dissent for substantially the reasons set forth in Sections I, II, and III of Judge Lynch's opinion, and I join in those sections. I share in the commitment that all individuals in the workplace be treated fairly, and that individuals not be subject to workplace discrimination on the basis of their sexual orientation, just as on the basis of their "race, color, religion, sex, [and] national origin." I cannot conclude, however, as the majority does, that sexual orientation discrimination is a "subset" of sex discrimination, Maj. Op. at 20–21, 24 n.10, 37, 38, et passim, and is therefore included among the prohibited grounds of workplace discrimination listed in Title VII.[1]

The majority's efforts founder on the simple question of how a reasonable reader, competent in the language and its use, would have understood Title VII's text when it was written – on the question of its public meaning at the time of enactment. The majority acknowledges the argument "that it is not 'even remotely plausible that in 1964, when Title VII was adopted, a reasonable person competent in the English language would have understood that a law banning employment

---

[1] In relevant part, Title VII renders it an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

discrimination 'because of sex' also banned discrimination because of sexual orientation.'" *Id.* at 24 (citation omitted). It does not contest the point, however, but seeks merely to justify its departure from ordinary, contemporary meaning by claiming that "[e]ven if that [is] so," its approach no more departs from the ordinary meaning of words in their contemporary context than supposedly occurred when sexual harassment and hostile work environment claims were first recognized by courts. *Id.* at 24–25. But as Judge Lynch has cogently explained, that is simply not the case. Dissenting Op. at 19–26. The majority does not discover a "plain" yet hidden meaning in Title VII, sufficiently obscure as to wholly elude every appellate court, including this one, until the Seventh Circuit's decision in *Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339 (7th Cir. 2017) (en banc), last year. Instead, it *sub silentio* abandons our usual approach to statutory interpretation. *See, e.g., Sandifer v. U.S. Steel Corp.*, – U.S. –, 134 S. Ct. 870, 876 (2014) (noting the "'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))); *Bilski v. Kappos*, 561 U.S. 593, 603 (2010) (quoting *Perrin* and applying the same canon of statutory interpretation); *Diamond v. Diehr*, 450 U.S. 175, 182 (1981) (same).

2

Because Sections I, II, and III of Judge Lynch's dissent are sufficient to answer the statutory question that this case presents, I do not go further to address the subject of constitutional interpretation, and do not join in Section IV. I agree with Judge Lynch, however, that constitutional and statutory interpretation should not be confused: that while courts sometimes may be called upon to play a special role in defending constitutional liberties against encroachment by *government*, in statutory interpretation, courts "are not in the business of imposing on private actors new rules that have not been embodied in legislative decision." Dissenting Op. at 65. To do so chips away at the democratic and rule-of-law principles on which our system of governance is founded – the very principles we rely on to secure the legitimacy and the efficacy of our laws, including antidiscrimination legislation.[2]

The Supreme Court said unanimously, just last Term, that the proper role of the judiciary in statutory interpretation is "to apply, not amend, the work of the People's representatives," even when reasonable people might believe that "Congress should reenter the field and alter the judgments it made in the past."

---

[2] Notably, all three states in this Circuit have prohibited workplace discrimination on the basis of sexual orientation, as have nineteen other states and the District of Columbia, all through legislation, and not judicial reinterpretation of existing prohibitions on sex discrimination. Under New York law, Zarda was thus able to present his claim that he was subject to workplace discrimination on the basis of his sexual orientation to a jury. The jury decided in favor of his former employer, Altitude Express.

*Henson v. Santander Consumer USA Inc.*, – U.S. –, 137 S. Ct. 1718, 1725–26 (2017). "[I]t is for Congress, not the courts, to write the law," *Stanard v. Olesen*, 74 S. Ct. 768, 771 (1954), and where "Congress' . . . decisions are mistaken as a matter of policy, it is for Congress to change them. We should not legislate for them[,]" *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 427 (1985) (citing *Victory Carriers, Inc v. Law*, 404 U.S. 202, 216 (1971)).

This hornbook separation-of-powers principle and the reasons behind it need not be elaborated here, for both should be well known to every law student. *See The Federalist No. 47*, at 251–52 (James Madison) (Carey & McClellan eds., 2001) (quoting Montesquieu to the effect that "were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator"); *see also I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983) (noting that "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted"). Together, they explain why judges interpreting statutes do their best to discern the ordinary, contemporary, common meaning of the statute's language. This is the law that was enacted through the democratic process, and the law we are to apply.

This approach does not always yield results that satisfy the judge charged with the task of statutory interpretation. It has not done so today. But I cannot faithfully join in the majority's opinion. I agree with Judge Lynch that when Title VII was written and, indeed, today, "bias against or disapproval of those who are sexually attracted to persons of their own sex" was and is viewed "as a distinct type of prejudice," and not as a subcategory of "discrimination against either men or women on the basis of sex." Dissenting Op. at 56. Accordingly, and agreeing with him that in interpreting an act of Congress, we must "respect the choices made by Congress about which social problems to address, and how to address them," *id.* at 66, I respectfully dissent.

REENA RAGGI, *Circuit Judge*, dissenting:

A majority of the court today extends Title VII's prohibition of employment discrimination "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1), to discrimination based on sexual orientation.  I respectfully dissent substantially for the reasons stated by Judge Lynch in Parts I, II, and III of his dissenting opinion and by Judge Livingston in her dissenting opinion.